## CHISHOLM, COMPTROLLER, *vs.* COLEMAN.

[APPEAL FROM ORDER GRANTING MANDAMUS.] .

1. *De facto governments ; what were not during the late rebellion.*—The so-called Confederate government, and the rebel government in the State of Alabama, were neither of them, in a legal proper sense, *de facto* governments during the late rebellion.

2. *Same; government in Alabama during rebellion.*—The government in Alabama, during that period, did not, and did not claim to, exercise the powers of the lawful, rightful government of the State, under the constitution of the United States ; nor was it, nor did it claim to be, the government of the State that was admitted into the Union under the laws and constitution of the United States, in the year 1819—did not claim or pretend to be that government—that government it destroyed.

Chisholm, Comptroller, v. Coleman.

It claimed to be, and was, a new separate and distinct government—a government forming, and being a constituent part and member of said Confederate government, in open and flagrant hostility to, and war against, the United States, and the said rightful government of said State.

3. *Same; what constitutes defined.*—A government *de facto*, whose acts bind the rightful government, is a government that gets the possession and control of the rightful government, and maintains itself there, by force and arms, against the will of the rightful government, *and claims to exercise the powers thereof.*

4. *Judge of circuit court of State of Alabama, elected before the act of secession; what forfeits and vacates office of.*—A judge of the circuit court of the State of Alabama, elected before the act of secession, who, after that act, enters the military service, and takes an office in the armies of the Confederate States, and receives the pay thereof, thereby vacates his office of judge, &c., as aforesaid, and as there could not be, therefore, there was no necessity that there should be, any judicial proceeding to try and determine the fact of forfeiture and vacancy.

5. *Present legitimate, loyal government of Alabama; what not bound to pay.* The present legitimate, loyal government of Alabama is not bound, nor under any obligation, either moral or legal, to pay the salary of such judge, while he was serving the illegal rebel government in said State.

APPEAL from the Circuit Court of Montgomery.
Tried before Hon. GEORGE GOLDTHWAITE.

THIS was an application, by Augustus A. Coleman, late judge of the 7th judicial circuit of Alabama, to the circuit court of Montgomery, for a *mandamus,* or other appropriate writ, to compel M. A. Chisholm, comptroller, &c., to draw his warrant on the State treasurer for the salary, claimed by said Coleman to be due him as such judge.

The petition recites that " petitioner, Augustus A. Coleman, was, on the 1st Monday in May, 1858, duly elected judge of the 7th judicial circuit of the State of Alabama ; that he was duly qualified, and was duly commissioned as such judge, accepted said office under said election, and did not resign or surrender said office during the constitutional term for which he was so elected, and was not removed from said office ; that on the 1st Monday in May, 1864, he was duly re-elected as judge of said circuit, and was duly qualified and commissioned as such judge, and under said last named election, accepted said office, and did not resign or surrender said office during the con-

stitutional term for which he was so re-elected; and was not removed from said office, otherwise than by the publicly known results of the late war, or by the act of Provisional Governor Parsons, or by the act of the convention of September, 1865, of Alabama." The petitioner then acknowledges to have received pay as judge, up to and including March 31st, 1862, and avers that he has received no other or further compensation, or salary, as such judge; avers demand on comptroller for his warrant on treasurer for "salary or compensation due petitioner, and which petitioner alleges to be due to him as judge, from 31st March, 1862, up to the time that, by the laws of said State, or of force in said State, his right to said office was lost or destroyed, or until his office was really vacated by the laws of said State, or other lawful authority." The petitioner then shows, that on demand on the comptroller for his warrant as aforesaid, that comptroller offered to give him a warrant for services as judge from January 1st, 1865, up to 20th July, 1865, if petitioner would receive the same in full satisfaction and extinguishment of any and all claims he might have against the State, as such judge, &c., and upon such condition only. The petitioner avers that a much larger amount than the comptroller is willing to pay, is due him' to-wit : $7,331.75, or near that sum, and for which comptroller refused and still refuses to draw his warrants. "One of the objections urged by said comptroller to drawing said warrant, &c., as aforesaid, is founded on the following facts, to-wit : That during the late war, and on the 16th of May, 1862, petitioner was chosen by the men of the 40th Alabama regiment of volunteer troops, colonel thereof, said troops consisting entirely of volunteers organized for the purpose of serving, and actually serving in the army of the Confederate States of America, and that petitioner, chosen as aforesaid, acted as the colonel commanding said regiment, although never commissioned as such colonel. For the eight months ensuing after the 16th of May, 1862, the said 40th Alabama regiment was in the military service, and formed part of the army of the Confederate States of America, and that petitioner received the pay prescribed by the laws of the Confederate States of America for his

services as such colonel, for said eight months ; that petitioner, at the end of said eight months, resigned his position, or station, as colonel, and said resignation was accepted." *Whilst* "*petitioner admits these facts*, he states there are other facts, to-wit: That during said eight months he retained his office as judge of said 7th judicial circuit, and performed some of the duties thereof, and after, and ever since his resignation as colonel, as aforesaid, he continued to retain his office as judge of said 7th judicial circuit (twice elected, qualified and commissioned), and to perform the duties thereof, until prevented by the military authorities of the United States, or the President thereof, after the surrender of the armies of the Confederate States of America, in 1865.   Petitioner further states that he has never done anything which was intended to vacate his office as judge of the 7th judicial circuit, nor anything which may, by the laws of the land, amount to vacating his office as judge of said 7th judicial circuit, or has any effect of the kind."

The petitioner then prays that the writ of *mandamus,* or other appropriate or proper order, be issued, to compel said comptroller to draw his warrant on the treasurer of the State of Alabama, in favor of petitioner, " for the amount of compensation or salary, to which petitioner is entitled by the laws of said State, upon the facts herein alleged and set forth," and for every other order or writ, or process and for all other relief to which he may be entitled.

The comptroller, for answer to the petition, " admits the facts set forth in said petition to be true, but says that a writ of *mandamus* should not be issued against him, the said Chisholm, as comptroller, as aforesaid, because the facts set forth in said petition, and admitted to be true, are insufficient to support a claim by said Coleman against the State of Alabama, for compensation as judge of the 7th judicial circuit of said State, for the time set forth in said petition."

It was agreed by the parties that the decision of the court be entered up as on final judgment, and that a peremptory *mandamus* might immediately issue, in event of a

decision for petitioner—each party reserving the right of appeal to the supreme court.

The court ordered a peremptory *mandamus* to issue, "commanding said comptroller to issue his warrant in favor of petitioner, for the amount of pay to which he is entitled as judge of the 7th judicial circuit, from and after the 31st March, 1862, up to the 20th day of July, 1865." From this judgment, the appellant appeals to this court, and here assigns as error, the judgment of the court below.

CHILTON & THORINGTON, for appellant.—1. Insisted that the application for *mandamus* is not sufficient ; that it fails to show that the salary claimed was for the exercise of the functions of an office of the State of Alabama, as one of the States of the American Union ; but the court must judicially take notice, that the salary accrued while Alabama was in resistance to the laws ; had thrown away her old constitution ; had framed a new one, and this officer formed one of the officers of the rebellious State endeavoring to carry out her declaration of independence of, and separation from, the United States. The executive, legislative and judicial departments exercised the power of the rebellious State ; these were the several parts of the machine which furnished the motive power in the rebellion. Shall the loyal people of the State, now restored to its loyalty and a member of the Union, be taxed to pay for the attempt to carry her out of the Union ? "Let the dead bury their dead." Let those things which are passed, and over which "even the fates have no power," rest where the rebellion left them. If the judges are to be paid who administered the laws of rebellious governments, why not pay the governor and the legislature ; why not pay the generals who led the militia to battle during the rebellion ? What's the difference ? They are but parts of the same rebel government.

2. But this court can not recognize that State government as legal, nor is there any obligation resting upon this State, now *reconstructed*, to pay any officer of the rebel State. Concede that private contracts not contravening the general law of the Union may stand, this does not

show that the debt of the rebel State must be borne by the State as now organized; no case can be found going to this length.

The very terms of the reconstruction act show that no legal State government existed in Alabama, even after the war had ceased, and it had been reconstructed under the proclamation of the president.

No department of the government had recognized the State of Alabama as existing when this salary accrued; and it is not for the courts to recognize what the political departments of the government ignore.—2 Phillimore on Int. Law, 26-7-8; 2 Simon's Rep. 194; *State of Georgia v. Stanton*, 6 Wal.; Chief Justice Chase's opinion in railroad case in Richmond.

JNO. W. A. SANFORD, Attorney-General, and JOHN A. ELMORE, on same side.—Judges of the circuit courts shall not hold any other office of profit or trust under this State, the United States or any other power.—Constitution of Alabama, section 10, of article 6; page 42 of Revised Code ; same provision applied during the Confederacy.

The petitioner held an office of profit and trust from the Confederate States, and received the pay therefor.

The order of the circuit court judge does not state the specific amount for which the warrant should issue; it orders the comptroller to issue his warrant for the pay of the petitioner, as circuit judge from the 31st March, 1862, to the 20th July, 1865. This is the judgment of a court, and equivalent to a judgment for the recovery of what is sued for ; no judgment can be sustained, or more properly, carried into execution, which fails to state the precise amount to be recovered. What sort of a judgment would that be, which says that the plaintiff recover the amount due as stated in the declaration, or the amount due as shown by the note declared on. The rule which says, that is certain which can be made certain, applies to contracts where proof can supply the uncertainty and other similar cases, but not to judgments ; it would be a singular judgment when you had to resort to proof to ascertain the amount.

14

This is not aided by the petition ; it no where shows the precise sum due, for which the petitioner asks the *mandamus* to issue ; it states that the sum due amounts to a *large sum*, to-wit, $7,331 75, or near that sum. The rule is, that when alternative allegations are made, that shall be taken which makes most strongly against the party making it. The allegation, then, is, that the sum due amounts to near the sum of $7,331 75, but not to that precise sum, nor to any precise sum.

But there was error in the judgment of the court in another particular. If the above objections are not sustained, then we insist that the warrant shall not issue for the salary which might have accrued from the time the Federal armies took and held possession of the State, declaring and enforcing martial law, and annulling all the functions and offices of the officers of the State, which was from about the 4th of May to July 20th, 1865.

Admitting that the acts of officers acting in a public capacity, by usurpation, are valid as regards their effect on the rights of private individuals, this does not establish their right to receive the pay, or fees belonging to the office, until they are ousted on a writ of *quo warranto.* In a contest between two persons claiming the office of a sheriff, the acts of the sheriff *de facto* are binding upon all persons in the same manner and with the same effect as if he was acting *de jure*, but he is not entitled to retain the fees of the office as against the officer *de jure ;* in other words, the alleged officer is not entitled to the fees at all.

GOLDTHWATE, RICE & SEMPLE, for appellee.—1. *Mandamus* is the proper remedy.—*Riggs v. Pfister*, 21 Ala. 469 ; *Moore v. Tenn. and Coosa Railroad Co.*, 36 Ala. 371.

2. State authority—State existence—neither ceased nor was suspended in Alabama by secession, or during the rebellion.

3. All acts of the legislature which were not in conflict with the constitution of the United States or of Alabama, though passed during the rebellion, were valid, unless the State ceased to exist. There is no reason for the pretence that the State did cease to exist. On the contrary, the

reconstruction acts of congress can only be sustained upon the ground, that the States, although existing, did not have a republican form of government; that congress is the political department of the government of the United States, and, as such, has the exclusive right to decide whether any State of the Union has a republican form of government; and that the decision of this question by this political department (congress,) however erroneous, is not revisable by any of the other departments, but is conclusive upon them, as well as upon the State, as to which the decision is made.

It is well settled, that the decision of political questions by the political department of the government of the United States, is conclusive upon the other departments, and upon all courts which recognize the paramount or supreme authority of the constitution and government of the United States.—*Rose v. Himely,* 4 Cranch's Rep. 272 ; *Gelston v. Hoyt,* 3 Wheaton's R. 324 ; *Kennett v. Chambers,* 14 Howard's (U. S.) R. 38 ; *Luther v. Borden,* 7 (U. S.) R. 1 ; *State of Georgia v. Stanton,* 6 Wallace's Rep. 50.

To deny the existence of the State during the rebellion, is to assert the validity of secession, or the power of the government of the United States to destroy or kill a State whenever a part of its people adopt a void ordinance of secession, and undertake to maintain it by armed rebellion. *White v. Cannon,* 6 Wallace's R. 443.

Conceding that the Confederate States government was not a *de facto* government, yet the government in Alabama was a *de facto* government. The rebel authority in the State claimed and controlled every thing, and was like Cromwell in his claim and control. But the Confederate States government was unlike Cromwell, in this, that it did not claim or control the whole United States, nor its capital, although it did claim to be a general government over a part of the territorial limits of the United States.

The case of petitioner is, in law, just as strong as if he had been a Union judge, and loyal to the government of the United States during the whole time for which he claims his salary. There is no legal principle which

distinguishes his claim from the claim of the most loyal judge.

Conceding petitioner's participation in the rebellion as a crime, or as treason, yet he cannot be punished therefor, until duly convicted thereof. He cannot be convicted thereof, or tried therefor, on a summary application, like *mandamus*, (where no jury trial is allowed.) Nor can he be convicted now in any proceeding, since the general amnesty proclamation of the president, of December 25th, 1868, which the courts are as much bound to notice and respect as they are to notice and respect any public law.—*Armstrong's Foundry*, 6 Wallace's Rep. 766.

The penalties for the failure of a judge to do his duties, or for his crimes, are prescribed in the statutes and constitution of Alabama, to-wit : Deductions from his salary on the certificate of the clerk, of his failure to hold his courts.—Revised Code, § 756, and impeachment for his misconduct and crimes.—See State Constitution.

It is not for the courts to create other penalties, and to enforce them in a summary proceeding like this, without any trial by jury.


PECK, C. J.—The facts stated in appellee's petition, we think sufficient upon which to determine this case ; certainly they are, when taken in connection with such facts as the court is judicially bound to know.

In this case, much of the argument of the learned counsel, on both sides, was devoted to the question, what was the nature and character of the government of the so-called Confederate States, and the government of this State, during the existence of the late rebellion ? It is a question that had much of my thoughts before the argument of this case, and my matured and deliberate judgment then was, and still is, that in no proper legal sense, can either of them be held to have been governments *de facto*. We admit they were governments that had in their power the lives, liberty, and property, of all men within their borders, and did with them whatsoever they pleased ; but no one, we think, who is able to speak of them with

candor, and without prejudice, will say they were governments friendly to liberty and equality.

A government *de facto,* in the proper legal sense, we understand to be, a government that unlawfully gets the possession and control of the rightful legal government, and maintains itself there, by force and arms, against the will of the rightful legal government, *and claims to exercise the powers thereof.*

Such was not the character of either of said governments. The counsel of the appellee spoke hesitatingly of the government of the said Confederate States ; did not seem to maintain, without doubting, that that government ever was a government *de facto,* but strongly and most earnestly insisted that such was the character of the government in this State during that period. They, or, at least one of them, contended that the government in this State did get possession of the legal, rightful government in the State of Alabama. It is admitted, it had the possession of the territory of the State, and control over the people within said territory, but it did not, and did not pretend to have, the possession of that lawful, constitutional government of said State, that was admitted into the Union, by the constitution and laws of the United States, in the year 1819—the government that thereby became a constituent part, and member of that great Union of States and governments, known and called, "The United States of America." No ; that government it destroyed. The government in this State, during the rebellion, never was, and never claimed to be, a part and member of the United States, or the government thereof. It claimed to be, and was, a constituent part and member of the said Confederate States, and, being so, partook of the nature and character of that government, of which it formed a part ; and it could have no other nature and character, any more than can the branch have a different nature and character from that of the vine. That the government of this State, and the government of the rebel States, were parts of, and constituted the government of the Confederate States, we suppose, no one will deny. They were, therefore, one in essence and substance, with the said Confederate govern-

ment. If that government was not, in a proper legal sense, a government *de facto*, neither were, or could, the governments of the several rebel States, be such, each one of which, as we have said, forming and composing a part of the said Confederate government. They were, therefore, rebel governments, and nothing more—governments in hostility to, and not parts of, the government of the United States. They were not even struggling to get the possession of the rightful government, or to exercise its powers, but to set up and establish a new, separate, distinct and hostile government, partaking in nothing in common, with the legal rightful governments ; but in everything, in nature, essence and character, utterly in opposition to, and using their utmost powers and strength, by military force and war, to overthrow them. This, for a time, they succeeded in doing, in the several rebel States, but altogether failed to accomplish, as to the United States, and were all of them, at length, overthrown and destroyed by the military forces of the United States. They came into being illegally, by force, and by force were subjugated and destroyed, and the rightful governments, in most of the States, have been reconstructed, restored and re-united with the government of the United States.

It is said, however, the government of the Confederate States has been recognized by the political departments of the United States, as a government *de facto*. If that were so, we would feel bound so to recognize, as such, both it and the government of the several rebel States, of which it was composed, and by which it was formed ; for in all political questions the courts follow and act in conformity to the decisions of the political departments of the government. But we deny that the political departments of the government of the United States have ever recognized the said Confederate government as a government *de facto*. It is true, the said Confederate government, from principles of humanity, was recognized *sub modo*, in a certain sense, as an organization, or government, if you please so to call it, illegal and traitorous in character, but having such power as rendered it necessary to treat with it, for the exchange and humane treatment of prisoners, &c., and, per-

Chisholm, Comptroller, v. Coleman.

haps, in a few other special cases, but were always careful not to recognize it, in the proper sense of the terms, as a government *de facto*—a government that could impose upon the government of the United States, or of the several States, the obligation, either morally or legally, to pay its debts, or the salary of its officers.

We are aware, that this view of the matter is not in harmony with the decisions of our predecessors, on the same subject, and, in so far as they are in conflict with this opinion, they are hereby overruled. We cite no authorities in support of this opinion, for the reason, that there are no cases analogous to it; neither the political or judicial history of the world furnish any such case; the peculiar nature and character of our Union and governments, both national and State, render it impossible there should be. Sometimes the struggle in England is referred to; we mean, what is known in history as the war of the Roses, between the houses of York and Lancaster. There, however, the contest was for the same crown and government, and not for a new crown and government; sometimes they fell into the hands of one, and sometimes into the hands of the other royal contestants; and the woes that this struggle caused for many years, sacrificed the best blood of the kingdom. But these wars never determined or settled the question, which of the two royal houses was rightfully entitled to the crown and government, but they were at length terminated, not by the sword, but at the marriage altar; the prince of one house marrying the princess of the other, and thus uniting both rights in the same hands. No one, we think, can fail to see, there is no proper analogy—no similarity even, between that case and the one we are considering, except that both are, perhaps, properly called civil wars. And the same may be said of every other historical case we know anything about. But, as we do not place our decision upon this view of the case, we will not lengthen our opinion by pursuing this new and inexplicable question further. We rest our decision upon the fact, that the appellee, by entering the military service, and becoming the commander of a regiment, in the army of the said Confederate States, thereby *forfeited and vacated* the office

of judge of the circuit court of the State of Alabama, to which he was elected in the year 1858. The 11th section of the 5th article of the constitution of this State, at that time declares, that "judges of the supreme and circuit courts, and courts of chancery, shall receive no fees or perquisites of office, nor hold any other office of profit or trust under this State, the United States, *or any other power*.

In this case, then, there could not be, and, therefore, there was no necessity there should be, any judicial proceeding to try and determine the fact of forfeiture and vacancy ; and, we further hold, that said appellee, by his election referred to in his petition, on the first Monday in May, in the year 1864, did not thereby become a judge of the legal government of the State of Alabama, but he thereby became a judge of the rebel government of said State. He was elected under rebel laws and a rebel constitution, and took the oath required by that constitution— an oath to support the constitution and laws of said rebel State of Alabama, and the constitution and laws of said Confederate government, and not an oath to support the constitution and laws of the legitimate government of the State of Alabama, and the constitution and laws of the United States. He did not, under said election, serve the legitimate government of the said State, but the rebel government of Alabama. Now, we hold to the doctrine, that the laborer is worthy of his hire, but he must seek his pay from the master he serves. If, therefore, he served the rebel State of Alabama, he must look to the rebel State of Alabama for his compensation. We think we might well hold, the legitimate government of Alabama, the present loyal government of said State, owes him nothing ; but as we cannot know, (however much we may suspect the fact,) that he did not remain loyal to the old government of said State until the 16th day of May, 1862, when he was, perhaps, tempted by the sword and epaulettes of the said Confederate States, to abandon his allegiance to the true State of Alabama, the State in which he had won all his honors, and entered the service, and took office under another and hostile power, by which act his said office of judge of the circuit court, of the lawful State of Alabama,

*became vacant.* Lest we might be wrong, and do injustice to the appellee by so doing, we decide, he is entitled to his salary, as judge of the seventh judicial circuit of said State, from and after the said 31st day of March, in the year 1862, up to the said 16th day of May, in the same year. As the order and judgment of the court below are not in conformity to this opinion, the same are reversed; and we proceed to render here, the order and judgment that should have been rendered by the court below.

It is, therefore, considered and ordered by this court, that the present auditor of public accounts of the State of Alabama, the successor in office of the said M. A. Chisholm, late comptroller, &c., on the application and request of the said Augustus A. Coleman, issue his warrant in favor of said Augustus A. Coleman for such sum as may be due him, as a judge of the circuit court of said State, from and after the 31st day of March, in the year 1862, up to the 16th day of May, in the same year, or that he show cause, at the next term of this court, on the first motion day of said court, why he hath not done so.