WIMBERLY v. DEACON.

No. 31578. Dec. 21, 1943.

As Corrected Jan. 12, 1944.

*144 P. 2d 447.*

Walter L. Gray and Rex Holden, both of Oklahoma City, for petitioner.

Dudley, Duvall & Dudley, of Oklahoma City, for respondent.

HURST, J. This is an action in the nature of quo warranto brought to settle conflicting claims to a membership on the Board of Regents of the University of Oklahoma. We have assumed original jurisdiction because of the public nature of the question involved.

Petitioner, Harrington Wimberly, alleges that he is the rightful holder of the office, that respondent, Erl Deacon, also makes claim thereto, and that as a result confusion and uncertainty exist as to the actual membership of the board, all to the detriment of the University of Oklahoma. He prays that the rightful holder of the office be judicially determined. Respondent, Erl Deacon, by answer, asserts that he is the lawful holder of the office and joins with petitioner in requesting a determination of the controversy.

The facts are not in dispute. On March 23, 1942, C. O. Hunt, who then held a commission as a reserve officer in the Army of the United States, but who was not then on active duty, was appointed a member of the Board of Regents of the University of Oklahoma for a term which would ordinarily have expired March 23, 1949. On or about June 1, 1942, he was ordered into active military service, and, without resigning from his state office, entered upon military duty as a commissioned officer. On August 17, 1942, the then Governor of Oklahoma, assuming that a vacancy existed on said board by reason of Hunt's entry into active military service, appointed respondent to membership thereon under the authority to fill vacancies on said board given him by 70 O. S. 1941 § 1241. Respondent qualified and assumed the duties of the office. On June 25, 1943, however, Hunt filed his written resignation with the then Governor (successor to the Governor who had appointed respondent), who thereupon appointed petitioner to said office. Petitioner qualified and was received by the Board of Regents as a member thereof at its regular meeting on July 14, 1943.

It will thus be seen that the question of whether petitioner or respondent is entitled to the office depends upon whether Hunt, by entering into active military duty as a commissioned officer in the Army of the United States, thereby vacated his civil office.

Article 2, sec. 12 of our Constitution, provides:

"No member of Congress from this State, or person holding any office of trust or profit under the laws of any other State, or of the United States, shall hold any office of trust or profit under the laws of this State."

Respondent contends (1) that a person on active duty as a commissioned

officer in the Army of the United States is the holder of an office of trust and profit under the laws of the United States within the purview of said constitutional provision, (2) that the office of member of the Board of Regents of the University of Oklahoma is an office of trust or profit under the laws of this state within the purview of said constitutional provision, and (3) that under said constitutional provision the same person may not hold both offices at the same time, and that upon Hunt's entry into active military duty his civil office immediately became vacant.

On the other hand, petitioner contends that a reserve officer called into temporary active duty, and who intends to return to civil life upon the cessation of hostilities, is not the holder of an office of trust or profit under the laws of the United States within the purview of said constitutional provision; that membership on the Board of Regents is not an office of trust or profit under the laws of this state within the purview of said constitutional provision; that there is no common-law incombatibility between serving as a reserve officer on temporary active duty in the Army of the United States and membership on the Board of Regents; and that, therefore, no vacancy existed at the time of respondent's appointment, and that such appointment was without authority and void.

At the outset of the consideration of this case, we point out that we are not, and must not be, concerned with the policy of the law as expressed in the constitutional provision. Only a question of law is presented, and the discussion of patriotic motives of public officers in our hour of national peril cannot and must not swerve us from correctly determining that question. If the giving up of a public office and its emoluments is necessary for the common good of all, such individual hardships may not be greater than the sacrifices of those countless thousands in private employment who are called into military service and who count not the cost to them in money, position, pain, suffering, or sacrifice. The Constitution means the same in war as in peace.

Before discussing the three propositions argued by the parties, the meaning of this constitutional provision, we will briefly refer to some well-recognized and applicable rules of construction that furnish a safe guide in connection with the interpretation and enforcement of constitutional provisions.

Those who frame statutes and constitutional provisions must always be presumed to be, and they generally are in fact, familiar with settled rules of statutory and constitutional construction, and they have a right to act on such rules and to expect the courts to follow them in construing and enforcing the same. And in order that there may be stability and certainty in the interpretation and enforcement of such provisions, as they are understood by those who frame them, the courts should scrupulously apply and follow such rules. To do otherwise is to run the risk of going contrary to the true meaning of such provisions, and to amend the statutes or Constitution by judicial fiat.

The first rule, and the one to which all other rules are subordinate, is that the meaning of constitutional provisions, as understood by those who framed and adopted the Constitution, is to be ascertained and given effect. Boswell v. State, 181 Okla. 435, 74 P. 2d 940; 12 C. J. 700; 6 R. C. L. 52; 16 C. J. S. 51; 11 Am. Jur. 674.

Another rule is that words appearing in the Constitution are to be given their plain, natural, and ordinary meaning, and no hidden meaning should be looked for by the courts. Pawnee County Excise Board v. Kurn, 187 Okla. 110, 101 P. 2d 614; 12 C. J. 703; 6 R. C. L. 52; 16 C. J. S. 56; 11 Am. Jur. 681.

Another rule is that when provisions have been adopted into the Constitution of a state which are identical with or similar to those of other states, it will be presumed that the framers of the Constitution were conversant with, and designed to adopt, the construction pre-

viously placed on such provision in other states. State ex rel. Tharel v. Board of Com'rs of Creek County, 188 Okla. 184, 107 P. 2d 542; 12 C. J. 717; 16 C. J. S. 76; 11 Am. Jur. 685. The reason for this rule is that, if it was intended to exclude the previous construction, the legal presumption is that the terms of the provision would be so changed as to effect that intent. McGrew v. Missouri Pac. R. Co., 230 Mo. 496, 132 S. W. 1076.

Constitutions are not made to mean one thing at one time and another at some subsequent time when the circumstances may have changed so as to make a different rule in the case seem desirable. A principal benefit expected from written constitutions would be lost if this were so. Cooley, Const. Lim. (8th Ed.) vol. 1, p. 124; 11 Am. Jur. 659. The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. South Carolina v. United States, 199 U. S. 437, 50 L. Ed. 261, 26 S. Ct. 110, 4 Ann. Cas. 737; Cooley, Const. Lim. (8th Ed.) vol. 1, p. 124; 11 Am. Jur. 659; 12 C. J. 718. This does not mean, however, that constitutional provisions, such as the due process clause, couched in general terms, may not have such a degree of elasticity as to make them applicable to new conditions not in existence at the time of their adoption, and hence not thought of by those who framed and adopted them. Euclid v. Ambler Realty Co., 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114, 54 A. L. R. 1016; 11 Am. Jur. 660.

Bearing in mind the terms of the quoted constitutional provision and these rules of construction, we now proceed to dispose of the three questions argued by the parties.

1. Is a reserve officer in the Army of the United States, after being called into active duty, the holder of an office of trust or profit under the laws of the United States within the meaning of the quoted constitutional provisions? We think so. Members of the Officers Reserve Corps are reserve officers and are commissioned in the Army of the United

States. 48 Stat. 154, 10 U. S. C. 355 a. The President is authorized to order such reserve officers into active military service for the period of the war in which we are now engaged and for six months thereafter. 54 St. 858; 55 St. 628, 50 U. S. C. 401; 55 St. 799, 800, 50 U. S. C. §§ 731, 732. They are paid a stated salary fixed by law. Although the record is silent thereon, we assume that Hunt was ordered into active military service for the duration of the war and for a period of not to exceed six months thereafter. It is provided that "while *not* on active duty," such officers are deemed not to hold "office of trust or profit" under the government of the United States. 48 Stat. 154, 10 U. S. C. § 372. This provision seems to suggest, however, that from the viewpoint of the federal government, at least, such officers, when they *are* on active duty, are deemed to be persons holding an office of trust or profit under the government of the United States. Commonwealth v. Smith (1942) 343 Pa. 446, 23 Atl. 2d 440.

While this question is one of first impression in this state, it has been passed on many times by courts of other states having similar constitutional provisions. See annotations in 26 A. L. R. 142; 132 A. L. R. 254; 140 A. L. R. 1499; 141 A. L. R. 1525; 142 A. L. R. 1517; 143 A. L. R. 1528; and 144 A. L. R. 1513. Until 1940 the authorities seem to have been unanimous to the effect that a person holding a military commission and engaged in active military duty held an office of trust and profit under the laws of the United States within the meaning of constitutional or statutory provisions, similar to ours, prohibiting dual office holding. 26 A. L. R. 142, note; People v. Drake (1899) 43 App. Div. 325, 60 N. Y. S. 309; Oliver v. Jersey City (1899) 63 N. J. L. 96, 42 Atl. 782; Kerr v. Jones (1862) 19 Ind. 351; Taylor v. Commonwealth (1830) 26 Ky. 401; State v. Sadler (1899) 25 Nev. 131, 58 P. 284; Chisholm v. Coleman (1869) 43 Ala. 204, 94 Am. Dec. 677; Lowe v. State (1918) 83 Tex. Crim. Rep. 134, 201 S. W. 986; Fekete v. East St. Louis (1924) 315 Ill. 58, 145 N. E. 692, 40 A. L. R. 650. The

military offices involved in most of the above cases were held in volunteer regiments, created only for the duration of the Civil or Spanish-American Wars, and not in the permanent or regular army. The Fekete Case, above, arose out of the first World War.

In the cases decided since 1939, however, there has been a division of opinion on the question.

The Pennsylvania court, in the case of Commonwealth v. Smith, above, under a constitutional provision similar to our own, held that a reserve officer in the army of the United States, when called into active service, became the holder of an office of profit and trust under the United States, and vacated a state civil office theretofore held. The Ohio court, in the case of State ex rel. Cooper v. Roth (1942) 140 Ohio State, 377, 44 N. E. 2d 456, held that entry into military duty through selective service constitutes "other public employment" under a statute prohibiting certain civil officers from "holding any other public office or employment," and that a soldier, upon entry into military service thereby vacated his civil office of city councilman. And the Arizona court held that a state superintendent of health, when inducted into the army of the United States as a major, became the holder of an incompatible office under the common law and that his induction, ipso facto, vacated his civil office. Perkins v. Manning (1942) 59 Ariz. 60, 122 P. 2d 857.

On the other hand, the courts of several of the other states have recently held that constitutional and statutory provisions against dual office holding do not apply to officers in the Army of the United States called to temporary active duty. State ex rel. Thomas v. Wysong (1943) (W. Va.) 24 S. E. 2d 463; Critchlow v. Monson (1942) 102 Utah, 378, 131 P. 2d 794; State ex rel. McGaughey v. Grayston (1942) 349 Mo. 700, 163 S. W. 2d 335; McCoy v. Board of Supervisors of Los Angeles County (1941) 18 Cal. 2d 193, 114 P. 2d 569; Carpenter v. Sheppard (1940) 135 Tex. 413, 145 S. W. 2d 562; Kennedy v. Cook (1940) 285 Ky. 9, 146 S. W. 2d 56; Re Advisory Opinion to Governor (1942) 150 Fla. 556, 8 So. 2d 26, 140 A. L. R. 1481; 9 So. 2d 172, 140 A. L. R. 1492; Gullickson v. Mitchell, 113 Mont. 359, 126 P. 2d 1106; City of Lynchburg v. Suttenfield, (1941) 177 Va. 212, 13 S. E. 2d 323.

Some of these cases may be distinguished. In the Texas case, the civil officer was a member of the National Guard who had been called into active service for one year's training. The court pointed out that the Constitution of Texas had been amended to exempt members of the National Guard from its provisions against dual office holding and placed its decision on that ground. It did not criticize or overrule the earlier Texas decision above cited. In the Kentucky case the civil officer was likewise a national guardsman who had been called for one year's training. The court said that he still acted under the commission issued to him by the Governor of Kentucky and that therefore he did not hold an office under the United States. In the Florida case the court held that under a constitutional provision against dual office holding, but exempting militiamen from its provisions, a reserve officer called to active duty did not thereby vacate his civil office, because "when the State Militia was federalized by Act of Congress and called into active service on behalf of the Federal Government, the exemption placed on it was not withdrawn." In the Virginia case, where the civil officer was an officer in the National Guard, the constitutional provision expressly provided that the inhibition therein contained against dual office holding should not apply to militia officers "because of recompense they may receive from the United States when called out into actual duty." And in Montana, where the Constitution provided that certain civil officers should not "be eligible to, or hold any other public office," the court held that the inhibition extended only to eligibility to the second office (that of a commissioned officer in the army) and that whether the civil officer was eli-

gible to the second office was a question for the federal authorities. The authorities are divided on this point.

However, it would seem that the cases from West Virginia, Utah, Missouri, and California may not be distinguished, and are contrary to the uniform holding of the courts of other states prior to 1940. These cases, without discussing or giving effect to the rules of construction, above, hold that constitutional provisions similar to the quoted provision of our Constitution were not intended to apply to commissioned officers temporarily serving in the armed forces of the United States during time of war. The reasoning behind such cases is that the Constitution should not be interpreted in a manner that will discourage public officers from rendering military service.

Were we at liberty to construe the Constitution as we pleased to effect whatever public policy we thought desirable, these last-cited cases would have weight. But, as above stated, and because of the rules of construction, above, we are not at liberty to do so. The question, therefore, is not one of policy for us to promulgate, but rather, what did the framers of our Constitution and those who adopted it in 1907 intend? Did they intend that the term "office of trust or profit under the laws of the United States" should not include commissioned officers of the Army of the United States on active duty?

As we have seen, at the time of the adoption of our Constitution in 1907, constitutional provisions of other states, similar to the quoted provision, had been uniformly construed to apply to military officers engaged in active service even though such officers were not professional soldiers or members of the permanent army. No doubt the purpose of such provision is to protect the public interest so that an officer holding an office of profit or trust under the state laws may give his undivided attention to the duties of his office without being hampered by an official allegiance to any other state or the United States.

Furthermore, the provision seems plain to us. The only requirement is that the federal office be one of "trust or profit." No distinction is made between civil and military officers, or between military officers in the regular army and those in the army called for the duration of any war in which the country may be engaged. To reach the conclusion that by the language used such an office was not intended is to indulge in speculation and to hunt for some hidden meaning not disclosed by the language used. This we should not do, as it might result in an amendment of the Constitution by judicial decree.

We conclude, therefore, that the framers of our Constitution used the words "office of trust or profit" according to their established meaning in 1907, and that such term includes a reserve officer engaged in active military duty in the Army of the United States.

It is, therefore, unnecessary to determine whether the two offices are incompatible under the common law.

2. The statutes provide that the Board of Regents "shall have the custody of the books, records, buildings and all other property of the University" (70 O. S. 1941 § 1242), and that the board shall "enact rules for the government of the University and all its branches," and shall have power to elect and remove the president, professors, instructors, officers, and employees of the University. 70 O. S. 1941 § 1244. It is apparent that membership on the Board of Regents is an office of trust, and that the board exercises an important part of the sovereign power of the state. See 42 Am. Jur. 882, 885; State v. Sowards, 64 Okla. Cr. 430, 82 P. 2d 324; Dickson v. People, 17 Ill. 191; State v. Jones, 143 Tenn. 575, 224 S. W. 1041 (school director). It is not merely an advisory office as in Patton v. Miller, 190 Ga. 123, 8 S. E. 2d 757, relied on by petitioner. It follows that a member of the Board of Regents of the University holds an office of trust under the laws of this state. We need not determine whether he also holds an office of profit.

3. Did Hunt's membership on the Board of Regents ipso facto become va-

cant by his entry upon active military duty as a commissioned officer, without the necessity of a judicial determination of the fact that a vacancy existed? Under the overwhelming weight of authority, this question should be answered in the affirmative. As pointed out above, similar constitutional provisions are found in many of the other states. In others there are statutes or city ordinances or charters to the same effect.

In Mechem on Public Officers (1889) it is said:

"Where, however, it is the holding of two offices at the same time which is forbidden by the Constitution or the statutes, a statutory incompatibility is created, similar in its effect to that of the common law, and, as in the case of the latter, it is well settled that the acceptance of a second office of the kind prohibited, operates ipso facto to absolutely vacate the first.

"No judicial determination is therefore necessary to declare the vacancy of the first, but the moment he accepts the new office the old one becomes vacant." § 429.

See, also, to the same effect, subject note in 86 Am. St. Rep. 578, published 1902.

Our constitutional provision is of the type mentioned.

As pointed out above, the framers of our Constitution and the people who adopted it must be deemed to have been familiar with these authorities (in general use in 1907) and the rules of law there announced. And since they used no language indicating an intention to exclude such construction, the legal presumption is indulged that they intended to adopt such construction.

Furthermore, the recent authorities are in accord with those above cited. 42 Am. Jur. 940, 941, 942; 22 R.C.L. 418, 419; 46 C. J. 947, 948; subject note in 100 A.L.R. 1164 (common law) and 1170 (Constitution and statute).

That constitutional provisions like section 12 are self-executing and fully operative is shown by the authorities just cited, and was specifically held by the Pennsylvania Court in Commonwealth v. Smith, above. And it is held that prohibitive and restrictive constitutional provisions, such as section 12, are, as a general rule, self-executing. Ex parte McNaught, 23 Okla. 285, 100 P. 27; 12 C. J. 731; 16 C.J.S. 101; 6 R.C. L. 62; 11 Am. Jur. 695.

The very purpose of the rule of ipso facto vacation by the acceptance of a prohibited office is to prevent confusion and uncertainty. In 42 Am. Jur. 941, it is said:

"The rule that acceptance of a second office operates to vacate one already held when not declared by positive provision of law seems to be based on a presumption of an election between the two offices as evidenced by the acceptance of the second. It is a certain and reliable rule, and one that is indispensable for the protection of the public. For the public has a right to know, in the case of attempted incompatible office holding, which office is held and which surrendered, and it should not be left to chance or to the uncertain whim of the office holder to determine. . . ."

While, as stated in 42 Am. Jur. 940, "if the former occupant refuses to vacate the office, his successor may be compelled to take the necessary legal steps to oust him," yet the decision must relate to the effect of the prior acts, and the decision as to who holds legal title to the office would relate back to the happening of the prior events. People ex rel. Fleming v. Shorb, 100 Cal. 537, 35 P. 163.

The petitioner argues that the rule stated in Webb v. City of Hugo, 169 Okla. 438, 37 P. 2d 621, is applicable. But that case has to do with failure to give personal attention to the duties of an office as required by section 11, art. 2 of the Constitution. Such constitutional provisions are generally held not to work an automatic vacation of the office, as is the case under section 12, but to merely afford a ground for removal. Young v. Town of Morris, 47 Okla. 743, 150 P. 684, Ann. Cas. 1918B, 450.

The petitioner also relies upon Wentz v. Thomas, 159 Okla. 124, 15 P. 2d 65, as authority for the proposition that the Governor is without authority to declare a vacancy without special authority of law. That case deals with power of removal under specific statutory authority. It is not in point here, since the constitutional provision declares the vacancy and it is for the Governor to fill the vacancy the moment it is created.

To sustain the contention of petitioner would be to subordinate the welfare of the state to the welfare of the officer. The Constitution was intended to have the opposite effect. Under the rule contended for by petitioner, five members of this court could, without resigning, become commissioned officers in the army, could be sent overseas so that it would be physically impossible for them to perform their judicial duties, and the work of the court would have to cease until a judicial determination of whether a vacancy exists was had or until they return, or until their terms of office expire and their successors are elected. The same may be said of the other state officers, the Criminal Court of Appeals, Highway Commission, Tax Commission, Board of Equalization, the various Boards of Regents and other boards and commissions, and the officers and boards that have control of the affairs of counties, school districts, cities and towns. The effect would be harmful to civil government. And, after all, civil government must go on at home while the war is being fought.

It is the duty of the Governor to "cause the laws of the state to be faithfully executed." Const. sec. 8, art. 6. Under the authorities cited above, the office was vacated by Hunt when he became a commissioned officer of the army on active duty. It was then within the power of the Governor to immediately fill the vacancy without awaiting a judicial determination of the existence of a vacancy. 70 O. S. 1941 § 1241; 42 Am. Jur. 940 § 78.

It follows that the respondent must be, and he is hereby, adjudged to be the holder of legal title to, and entitled to exercise the duties and powers of, said office.

Mr. Justice RILEY having certified his disqualification, Hon. CECIL CHAMBERLIN was appointed Justice in his stead.

CORN, C.J., and OSBORN, BAYLESS, and DAVISON, JJ., concur. GIBSON, V.C.J., and WELCH and ARNOLD, JJ., and CHAMBERLIN, Special Justice, dissent.

GIBSON, V.C.J. (dissenting). I cannot agree with the majority opinion wherein it holds that Hunt by his entry upon military duty immediately vacated his office as a member of the Board of Regents. I am of the opinion that the constitutional provision involved (section 12, art. 2) should be interpreted to mean that one holding an office of trust and profit in this state renders himself ineligible to hold that office by accepting an office of trust or profit in another state or under the federal government.

As I view it, final determination of the controversy depends upon the interpretation to be placed upon section 12, art. 2, Constitution, and upon certain Territorial statutes adopted by the Constitution (Schedule, sec. 2).

The question of incompatibility in public offices arising under the rule obtaining at common law plays little, if any, part in the matter. The constitutional provision, above, supersedes the common law, and furnishes the exclusive key to the situation. It is clearly self-executing, and required no vitalizing force by subsequent enactment of the Legislature. Section 12, I mean to say, superseded the common-law rule of incompatibility so far as concerns holding office under separate governments.

I may say here that the rule of implied resignation or ipso facto vacation of an office as a result of the acceptance by the incumbent of another and incompatible office does not apply in those instances where the two offices were cre-

ated by different governments. 100 A. L.R. 1183, Ann. It is there said that the rule, above, does not apply in cases such as this; and in support of the statement cases from a number of states are cited, among them, DeTurk v. Com., 129 Pa. 151, 18 Atl. 757, 5 L.R.A. 853. Therein it is said:

" 'Regard must be had to the fact that the former is an office under the government of the United States and the latter an office under the state government. If the titles to these offices were derived from a common source it might well be held that an acceptance of the second office was an implied resignation and vacation of the first. This is the common-law rule, and the current of authority in this country sustains it. But the state cannot declare the federal office vacant, nor remove the incumbent from it. It may, however, enforce the constitutional provision by proceedings to test his title to the office he holds under its laws, and it may remove him from that office if he does not surrender the office he holds under the government of the United States.' "

Other cases might be cited to the effect that the rule that the acceptance of a second incompatible office operates as the vacation of or resignation from the first office does not apply in such cases.

Said section 12 does not say that a public officer of this state shall be deemed to have vacated his office by accepting an office of trust or profit under the laws of the United States. It acts somewhat in reverse of that principle. The section simply makes an officer of the United States ineligible to hold state office. If a United States officer were to accept and occupy a state office and enter upon the duties thereof, one would hardly contend that he was not actually a de facto state officer.

So, if a legally constituted state officer accepts a federal office, he thereby may become ineligible to hold the state office, but, unless he resigns the state office, in any event he remains a de facto state officer. His office is not summarily to be declared vacant. It has long been the law in this state that when an office exists under the law and one is elected or appointed to such office, and duly qualifies and enters upon his official duties, as in this case, he is a de facto officer, and his acts are valid, notwithstanding he may not possess all the necessary qualifications as prescribed by law to hold such office. Morford v. Territory, 10 Okla. 741, 63 P. 958.

In Stafford v. Cook (Ark.) 252 S. W. 597, the court had under consideration the effect of subsequent ineligibility of a duly constituted officer with respect to the question of vacancy in the particular office. My views here are in accord with the holding in that case, which was as follows:

"If officers were eligible at the time they took office, their subsequent ineligibility, though it may afford ground for removal, held not to vacate the office ipso facto. . . ."

See, also, 46 C. J. 974, 120.

Here, Hunt became ineligible to hold his membership on the board by reason of the provisions of the Constitution. But that did not deprive him of color of title. In 46 C. J. 1056, § 370, it is said, "Persons having color of title may be regarded as de facto officers, even though legally they are not eligible for the position."

Had the framers of the Constitution thought it advisable to declare a state office vacant, ipso facto, on acceptance by the incumbent of an office under the laws of the United States, they easily could have so provided. They undoubtedly had this question in mind, for by adopting certain of the statutes of the Territory it is made clear that they were not unmindful of the evils of dual office holding, and of the conditions under which an office shall become vacant. Section 2, Schedule.

The statutes so adopted by the Constitution were 51 O. S. 1941 §§ 6, 8. Said section 6 provides that no person holding any office under the laws of this state shall, during his term of office, hold any other office under the laws of this state. The Constitution, section 12,

above, merely enlarged that law to dual office holding in the state and federal governments. The statute does not provide that dual office holding in the state shall work a vacancy or forfeiture of the first of the offices to be occupied by the party.

To declare an office vacant, or to declare a forfeiture thereof, is a serious matter, and the power in this regard should be well defined and cautiously invoked. By the adoption of section 8, above, the framers of the Constitution clearly and specifically defined the conditions under which the appointing authority could declare an office vacant. Said section 8 reads as follows:

"Every office shall become vacant on the happening of either of the following events before the expiration of the term of such office:

"First. The death of the incumbent or his resignation.

"Second. His removal from office or failure to qualify as required by law.

"Third. Whenever any final judgment shall be obtained against him for a breach of his official bond.

"Fourth. Ceasing to be a resident of the state, county, township, city or town, or of any district thereof, in which the duties of his office are to be exercised or for which he may have been elected or appointed.

"Fifth. Conviction of any infamous crime or any offense involving a violation of his official oath; provided, that no conviction, as a cause of vacation of office, shall be deemed complete so long as an appeal may be pending, or until final judgment is rendered thereon.

"The fact by reason whereof the vacancy arises shall be determined by the authority authorized to fill such vacancy."

Though it has been held that the expression in the Constitution or statutes of the circumstances which shall bring about a vacancy does not necessarily exclude all other grounds (42 Am. Jur. 977), the circumstances which will work

a forfeiture must be prescribed by the Constitution or statutes, and neither the appointing authority nor the courts may declare a forfeiture unless the law specifically grants the authority. Here, we have a statute having the force and effect of a constitutional provision, which sets out specifically the circumstances under which the appointing authority may declare a vacancy or a forfeiture. It does not say that he may declare a vacancy or forfeiture where an incumbent accepts another office. As said in 43 Am. Jur. 39:

"Where statutes relate specifically to forfeitures of an office and to the removal of the incumbent, it is presumed that the Legislature intended to cover the entire ground, and that there are no causes for forfeiture or removal except those prescribed."

In those instances where an office is held under color of title, as in this case, the power to declare a vacancy is nothing short of the power to declare a forfeiture. Section 8, supra, empowers the appointing authority to declare a vacancy in certain cases where a vacancy clearly exists, such as death or resignation of the incumbent, or his removal from office. And he may declare a vacancy in certain instances where there has been a forfeiture of the office, or a forfeiture of the right to claim the office.

So far as the appointing authority's power to declare a vacancy is concerned, the statute is exclusive as respects those offices which are held by one under color of title. Other than the grounds under which the appointing authority is empowered to act, the question whether an officer has forfeited his office is a judicial one to be determined by proper proceedings.

Section 12 of the Constitution, supra, says that a person holding a federal office of trust or profit shall hold no state office of trust or profit. The total effect thereof so far as concerns a state officer is that he may forfeit his state office by accepting a federal office.

The question whether the federal office is one of trust or profit within the

meaning of the constitutional provision has not been left to the decision of the appointing authority; it is a judicial question to be determined by proper proceedings.

The Governor has no inherent power to declare a vacancy by reason of forfeiture. He must find that power in the Constitution or statutes. 46 C. J. 984, § 146.

In cases of this character where a forfeiture is said to have taken place, the proper remedy so far as concerns the state is a proceeding in the nature of quo warranto to declare a vacancy. 12 O. S. 1941 §§ 1531, 1532, 1533. Such proceeding is proper "when any person shall . . . unlawfully hold or exercise any public office. . . ." Section 1532. And the Attorney General may institute the proceeding on his own motion. Section 1533. As said by the Territorial Supreme Court in Bradford v. Territory, 2 Okla. 228, 37 P. 1061:

"Such proceeding is authorized whenever any public officer shall have done or suffered any act which, by the provisions of law, shall work a forfeiture of his office."

The purpose is to have the office declared vacant. Id. See, also, State v. Batson, 170 Okla. 103, 39 P. 2d 76.

Since the officer in question remained a de facto officer of this state, the office could not have become vacant until he resigned or the same declared vacant by judicial decree in proceedings in the nature of quo warranto, or unless it should become vacant on account of some other of the conditions designated in section 8, supra.

Here, Hunt resigned before his office was declared vacant by judicial process, or before it became vacant for any other cause.

The appointment of the respondent, Erl Deacon, occurred before Hunt resigned, and therefore before a vacancy occurred. His appointment was premature and of no effect.

Petitioner, Wimberly, received his ap-

pointment after Hunt resigned. His appointment was therefore timely, and served to fill the vacancy created by the resignation.

For the foregoing reasons, I respectfully dissent.

———

ARNOLD, J., and CHAMBERLIN, Special J. (dissenting). The real issue in this case is whether, when Hunt was inducted into the military service, he then held a federal office of profit or trust within the meaning of section 12, art. 2, of our Constitution.

In view of the interpretation of New York, from which state we got our constitutional provision in question, and the interpretation of other states on similar provisions before the adoption of our Constitution, we admit that an officer in the United States Army, as distinguished from the army of the United States, holds an office of trust and profit with the United States Government and such an office was within the contemplation of the framers and adopters of our Constitution, and such an office falls within the purview of the foregoing section of article 2 of our Constitution.

We also admit, for the sake of argument, though the question is not here, that the acceptance of a commission in the United States Army, as distinguished from the army of the United States, and entry of service by reason thereof, would amount to a resignation from any state civil office of trust or profit held by the one so commissioned.

This being a case of first impression in this jurisdiction, the meaning and extent of the constitutional provision involved should be determined in the light of the reasons for its adoption, as well as from the language used. This gives rise to the query, against what persons and against what practices or conduct was the provision directed? Critchlow v. Monson, 102 Utah 378, 131 P. 2d 794. Was it directed against a citizen who, under the exactions of the United States Government, is called upon for the performance of the supreme and noble duty

of contributing to the defense of the rights, the honor, and the very existence of our national government and our way of life? Certainly not.

At the time of adoption of our Constitution, military officers held commissions in the regular army. They were "professional soldiers," and their employment was permanent in nature. We then had no military officers holding temporary commissions terminable at the expiration of an existing national emergency. That there is a clear distinction between the two classes of officers is recognized in many of the old decisions from other states. Some of the decisions in other states do hold that a person holding a military commission holds an office of profit and trust under the laws of the United States within the meaning of constitutional or statutory provisions prohibiting dual office holding, but on examination of those cases it is disclosed that they involved officers in the regular or United States Army. See Kerr v. Jones (1862) 19 Ind. 351; Oliver v. Jersey City (1899) 63 N. J. L. 96, 42 Atl. 782, and other cases annotated in 26 A. L. R. 143, et seq. There is a difference between an officer in the United States Army and an officer in the army of the United States. The one is a professional soldier pursuing a permanent profession. The other is merely in the armed forces on temporary active duty. This distinction is pointed out in State ex rel. McGaughey v. Grayston, 349 Mo. 701, 163 S. W. 2d 335, a case which cannot be distinguished in principle from the instant case. Therein it is held:

"The constitutional prohibition against the holding of an office of profit under the United States and under the state at the same time does not apply to a militiaman who enters the service of the United States in time of emergency or war so as to effect a removal of a circuit judge who was ordered into federal service as a colonel of the Missouri National Guard."

And:

"The members of the National Guard, the National Guard Reserve, the Offi-cers' Reserve Corps, the enlisted Reserve Corps, the National Army and the Organized Reserves are primarily civilians and their units are distinct from the 'national army' and the fact that they leave their civil pursuits to take up arms for their country during the time of emergency or war does not make them 'professional soldiers.' "

Critchlow v. Monson, Secretary of State, et al., 102 Utah, 378, 131 P. 2d 794, is a case which admittedly may not be distinguished from the instant case. Therein it is held:

"The constitutional provision that no person holding any office under the United States Government shall hold any office under the state government of Utah was designed to prevent practices which would tend to undermine the stability of the state government, and it was aimed at political office seekers, particularly those who might seek to draw two full time salaries from positions incompatible and impossible to perform simultaneously without neglecting performance of the duties of the state office."

And:

"The constitutional provision that no person holding any office under the United States Government shall hold any office under the state government of Utah has no reference to those who are called to military duty during time of war or national emergency, who plan to be absent from duties in the state no longer than the emergency reasonably requires."

And:

"The constitutional provision that no person, while holding any 'office' under the United States Government, shall hold any office under the state government, did not automatically forfeit state Supreme Court justice's position as justice when he was sworn into the army and was ordered to active duty as a reserve officer of the United States Army."

In Gullickson v. Mitchell, Secretary of State, 113 Mont. 359, 126 P. 2d 1106, it is held:

"Where regularly elected Attorney General was ordered to report for active military service at Washington, D. C., as a major in the Judge Advocate Gen-

eral's Department, before expiration of his term of office, the office was not 'vacated' by reason of constitutional provision that no officer mentioned therein, including Attorney General, shall be eligible to or hold any other public office during his term."

In McCoy v. Board of Supervisors of Los Angeles County et al., 18 Cal. 2d 193, 114 P. 2d 569, it is held:

"The constitutional provision that no person holding lucrative office under United States shall be eligible to any civil office of profit under state does not mean that state officer, on whom additional duties are imposed by President of the United States under Federal Constitution and laws in aid of raising and maintenance of army for prosecution of war, forfeits his office."

In State ex rel. Thomas v. Wysong (W. Va.) 24 S. E. 2d 463, it is held:

"In determining the eligibility of a person who is an officer in the United States Army, to hold a state office to which such person has been elected, court will distinguish between a temporary appointment as an army officer and a commission in the regular military establishment of the United States."

And:

"Provisions of Constitution that certain executive officers, including the Attorney General, shall not hold any other office during the term of their service, does not render persons ineligible to office of Attorney General, who, in time of war, was holder of temporary commission as captain in the United States Army."

Other decisions to the same general effect are Re Advisory Opinion to Governor (Fla.) 8 So. 2d 26, 140 A.L.R. 1481; Re Advisory Opinion to Governor (Fla.) 9 So. 2d 172, 140 A.L.R. 1492; City of Lynchburg et al. v. Suttenfield, 177 Va. 212, 13 S.E. 2d 323; Kennedy et al., Appts., v. Cook, 285 Ky. 9, 146 S.W. 2d 56, 132 A.L.R. 251; State v. Joseph, 143 La. 428, and Re Opinion of Justices, 307 Mass. 613, 29 N.E. 2d 738. These courts hold generally that it was never the meaning, purpose, or intent of such provisions to deprive a citizen of a state civil office on account of his temporary active duty as an officer in the Army of the United States. As stated in State ex rel. Thomas v. Wysong, supra:

"The rights of a citizen to hold office is the general rule; ineligibility the exception. Courts are hesitant to take action resulting in deprivation of the privilege to hold office, except under clear and explicit constitutional or statutory requirements."

And:

"We would hesitate to impute to the framers of our Constitution an intent to deprive citizens of the emoluments and honors of a civil office on the ground that they are engaged temporarily in military service in time of war. No such result was intended or reached in the framing and adoption of our Constitution. . . ."

The rule of these cases is formulated upon sound reasons and should be adopted. It is further submitted that the expression "office of trust or profit," as used in section 12 of article 2 of our Constitution, was never intended by the framers of that document or by the people in its adoption to include or mean a position held by the citizen-soldier as an officer of the Army of the United States serving temporarily during time of war, and that such definition was not then and is not now the plain, ordinary, natural, and commonly accepted and understood meaning of such expression.

Furthermore, the rule of these cases is in strict accord with the historical reason for the inclusion of such provisions in the Constitutions of the several states. That reason, as pointed out by some of the cases and found elsewhere in studies of government, was the desire on the part of the states to prevent the domination and administration of state government and affairs by the federal government by prohibiting the federal official from holding state office. Such reason was sound in policy and purpose. In fact, it is as sound today as it was in its inception. But it can hardly be claimed that a citizen temporarily in the Army of the United States as a commissioned officer during time of war, whose very purpose in such

574

military service is to achieve a victorious peace as soon as possible, then retire from the army and resume his peace-time profession and vocation, was ever or is now within the historical reason for such rule. His commission, which constitutes him an "officer," is temporary; his term and tenure of service are temporary and indefinite. His civil right to hold office should not be suspended during this period of temporary service by a rule of law or constitutional interpretation when the very reason for the rule fails.

It should be pointed out at this point that all the evils that may attend our interpretation of our constitutional provision may be averted by the Legislature as has been done by many states. But we are not the legislative body and should not by judicial legislation pervert the intention of the people by reading into our constitutional provision an intention on the part of the people that has no foundation in reason. Such a strict and inelastic view or interpretation of the constitutional provision in question would lead to many unanticipated evils which could only be averted by a constitutional amendment.

Being of the opinion that there is no constitutional bar, it is necessary to determine whether the common law, which prohibits any person from holding two incompatible offices at the same time, would permit C. O. Hunt to serve as a member of the Board of Regents while on temporary active duty as a commissioned officer in the Army of the United States. This principle of common law has been supplemented but not displaced or supplanted by the constitutional provisions. State ex rel. Thomas v. Wysong, supra. Incompatibility, as here used in the correct legal sense, is such as arises from the nature of the duties, powers, and rights of the two offices. The early authorities are collected and the rule stated in a brief note in 23 Harvard Law Review, 231, is as follows:

"At common law one person can hold two offices unless they are incompatible. Preston v. United States, 37 Fed. 417. Offices are said to be incompatible when their duties are so numerous and exacting that the same person cannot perform them with ease and ability or when they are so related that a presumption fairly arises that they cannot be executed by the same person with impartiality and honesty. See 6 Beacon's Abridgments, Title, Offices (k). Incompatibility does not consist in the physical impossibility to discharge the duties of both offices at the same moment. People v. Green, 58 N.Y. 295. . . . But if one office is subordinate to the other, or if one is subject in some degree to the revisory power of the other, or if the functions of the two are inherently inconsistent and repugnant, they are incompatible. State v. Goff, 15 R.I. 505."

See, also, Bryant v. Cattell, Auditor of State, 15 Iowa, 539, and the cases and annotations in 26 A.L.R. 142, 132 A.L.R. 254, 140 A.L.R. 1499, 141 A.L.R. 1525, 142 A.L.R. 1517, 143 A.L.R. 1528, 144 A.L.R. 1513, and 146 A.L.R. 1486. Applying this rule, it is obvious that the two offices here under consideration are not incompatible and that there is no such conflict in the nature of the duties, powers, and rights of the two offices which would constitute the holding of both offices incompatible with the public interest or sound public policy. As suggested by the court in Kobylarz v. Mercer (1943) 130 N.J.L. 44, 31 A. 2d 208, a different rule or conclusion might properly obtain where the holder of the civil office becomes a member of the regular army in permanent service as his profession.