**Charles NESBITT, Petitioner,**

v.

**Ed APPLE, Respondent.**

**No. 84972.**

Supreme Court of Oklahoma.

Feb. 28, 1995.

As Corrected March 8, 1995.

---

LAVENDER, Justice.

## I. INTRODUCTION.

Petitioner, Charles Nesbitt (petitioner) has filed this original action seeking a writ in the nature of quo warranto against respondent, Ed Apple (respondent), to determine which of the two parties is the lawful incumbent in the office of Oklahoma Corporation Commissioner. We assume original jurisdiction and settle the title to the office in favor of respondent.

Essentially, three issues are raised by petitioner in support of his application. These are: 1) the dispute is *publici juris* in nature and one where original jurisdiction should be assumed; 2) the Corporation Commission office in dispute was vacant the latest on January 3, 1995, the date of commencement of the Congressional term for which J.C. Watts, Jr. was elected in November 1994; and 3) on January 4, 1995, the date Governor David Walters' appointment of petitioner was to take effect, the office of Corporation Com-

missioner claimed to be held by Mr. Watts was in law vacant because he had never filed the two constitutional oaths of office and a statutory loyalty oath for the office of Corporation Commissioner—Mr. Watts was, thus, never a *de jure* Corporation Commissioner, but only a *de facto* Corporation Commissioner and as such was subject to replacement at any time by gubernatorial appointment prior to the end of Governor Walters' term which expired on January 9, 1995. After stating the facts stipulated to by the parties and other facts we deem pertinent, we will take up the issue of whether original jurisdiction should be assumed, then the oath filing issue and, lastly, the issue surrounding Mr. Watts' election to Congress.

## II. FACTS.

The parties have stipulated to the following facts:

1. J.C. Watts was elected to the Oklahoma Corporation Commission in 1990. On January 14, 1991, J.C. Watts commenced a six-year term as Corporation Commissioner, ending on January 13, 1997. Likewise, on this date, David Walters commenced a four-year term as Governor of the State of Oklahoma, ending on January 9, 1995.

2. On January 14, 1991, J.C. Watts was administered the Constitutional oath of office as Corporation Commissioner on the steps of the State Capitol by Justice Marian Opala of the Oklahoma Supreme Court and subscribed to the oath.

3. On January 14, 1991, J.C. Watts was administered the Constitutional oath of a Corporation Commissioner at the Jim Thorpe building by Judge Charles Owens of the District Court for Oklahoma County and subscribed to the oath. At the same time, J.C. Watts took and subscribed to the loyalty oath set forth in 51 O.S. § 36.2A.

4. J.C. Watts served as Corporation Commissioner for the State of Oklahoma from January 14, 1991.

5. On July 11, 1994, Commissioner J.C. Watts, declared his candidacy for the office of United States Representative for the Fourth District of Oklahoma and filed a declaration of candidacy as required by 26 O.S. § 5–111, a copy of which is attached to petitioner's brief as exhibit "4."

6. In 1994, during J.C. Watts' election campaign for the Republican nomination as candidate for the United States House of Representatives, J.C. Watts stated his intention to retain his position as Corporation Commissioner through January 9, 1995 and not accept a position in the United States House of Representatives until that date in order that the newly elected governor could appoint Commissioner Watts' replacement as Corporation Commissioner.

7. On November 8, 1994, Commissioner J.C. Watts was elected to the office of United States Representative—District No. 4, and the election returns were certified to the United States House of Representatives on November 15, 1994.

8. On December 23, 1994, Governor Walters filed with the Secretary of State an Order of Appointment, whereby Governor Walters stated that he was appointing Charles Nesbitt as a Corporation Commissioner to serve the unexpired term of J.C. Watts, effective at 12:00 noon on January 4, 1995.

9. On January 3, 1995, at 12:00 noon, the term of the 104th Congress of the United States began in accordance with Amendment XX of the United States Constitution. The 104th Congress assembled at 12:00 noon on January 4, 1995.

10. On January 4, 1995, Charles Nesbitt was administered, subscribed, and filed with the Oklahoma Secretary of State the three oaths of office prescribed by the Constitution and laws for Corporation Commissioner.

11. On January 5, 1995, Charles Nesbitt forwarded two letters to the Corporation Commission, one addressed to Cody Graves and Bob Anthony, the other to General Jay Edwards, the Commission's General Administrator. The letter to Commissioners Graves and Anthony demanded that Nesbitt be recognized as Commissioner and the letter to General Edwards requested initiation of procedures to activate employment with the Commission for Mr. Nesbitt.

12. The parties stipulate to the authenticity of the January 6, 1995 Corporation Commission minutes and order attached in respondent's Appendix at pages 27 through 31.

13. On January 9, 1995, Frank Keating was inaugurated as Governor of the State of

Oklahoma and was administered the oaths of office.

14. On January 9, 1995, J.C. Watts caused a written resignation letter, stating that he was resigning his position as Corporation Commissioner, to be physically delivered to Governor Keating, effective upon hand-delivery to Governor Keating. This resignation letter was delivered to Governor Keating after Governor Keating's inauguration, and after Governor Keating had taken the oaths of office and had taken possession of the Governor's office.

15. On January 9, 1995, following his acceptance of J.C. Watts' resignation, Governor Keating filed an Order of Appointment with the Oklahoma Secretary of State, stating that the Governor was appointing Ed Apple to fill J.C. Watts, Jr.'s Corporation Commission seat.

16. On January 9, 1995, following his appointment to the Oklahoma Corporation Commission, Ed Apple was administered, subscribed, and thereafter duly filed with the Secretary of State the three oaths of office prescribed by the Constitution and laws of Oklahoma for Corporation Commissioners.

17. On January 9, 1995[1], after his resignation letter had been delivered to Governor Keating, J.C. Watts took the oath of office as a United States Representative.

18. J.C. Watts did not receive a congressional salary for any period prior to taking the oath of office as Representative in Congress.

19. J.C. Watts was paid a salary as Corporation Commissioner through January 9, 1995.

20. The parties stipulate to the authenticity of the pages from Corporation Commission

orders dated January 4th and 6th, 1995, that are attached in respondent's Appendix pages 5 through 9.

In addition to these stipulations the record is undisputed that Governor Walters, prior to leaving office on January 9, 1995, gave no notice, either verbal or written, prior to Mr. Watts' resignation of the same date, to the effect the Corporation Commission seat claimed to be held by Mr. Watts had been declared vacant by virtue of failure to file with the Secretary of State one or more of the oaths mentioned above. Further, the record is undisputed Mr. Watts was given no opportunity for any hearing, formal or informal, by Governor Walters on the issue of whether he was properly serving as a member of the Corporation Commission by failure on his part to file with the Secretary of State any of the three required oaths. Also, petitioner does not contend before this Court that Governor Walters, prior to leaving office on January 9, 1995, made any express finding that Mr. Watts vacated the office of Corporation Commissioner because of failure to timely file any of the three oaths.[2] Finally, as the record now stands, it is a disputed issue of fact as to whether Mr. Watts filed the three oaths with the Secretary of State.[3] We believe the facts as stipulated by the parties and those noted immediately above are sufficient to decide this matter.

## III. ORIGINAL JURISDICTION WHICH WE HAVE BY CONSTITUTIONAL PROVISION AND STATUTE SHOULD BE EXERCISED BECAUSE THE MATTER IS PUBLICI JURIS IN NATURE.

■ The OKLA. CONST. art. 7, § 4, grants authority to this Court to issue, hear

---

1. In stipulation number 17 submitted by the parties the date is shown as January 9, 1994. We assume this was a typographical error and they meant 1995.

2. The Order of Appointment by Governor Walters of petitioner, in fact, gives as the only reason for the appointment Mr. Watts' election to the United States House of Representatives. No other reason for appointment of petitioner or determination as to the basis the office of Corporation Commissioner was deemed vacant by Governor Walters is contained in the Order of Appointment.

3. Although the evidence is not conclusive, respondent has presented evidentiary material that Mr. Watts' three oaths were submitted to the Secretary of State's office for filing by personnel of the Oklahoma Corporation Commission in the normal course of business in January 1991. Petitioner, on the other hand, has presented evidentiary material that a search of the office of the Secretary of State has failed to uncover any of the three oaths as having been filed with that office.

and determine writs of quo warranto and an Oklahoma statute, 12 O.S.1991, § 1532, provides that an action in the nature of quo warranto may be brought in the Supreme Court or district court. Previously, we have exercised our original jurisdiction in actions in the nature of quo warranto when the issues raised were held to be *publici juris.* *State ex rel. Stuart v. Rapp,* 632 P.2d 388, 389 (Okla.1981); *State ex rel. Oklahoma Tax Commission v. Mourer,* 596 P.2d 882, 885 (Okla.1979). Recently, we also assumed original jurisdiction in a case between a State senator and Governor Walters involving the question of whether failure to take a certain statutory oath by the Governor or other public officials resulted in a vacancy in office. *Hendrick v. Walters,* 865 P.2d 1232 (Okla. 1993). Petitioner correctly asserts that this matter involves issues that are *publici juris.* The case has statewide impact in that it involves who is the lawful holder of a statewide public office having far-reaching regulatory authority over numerous public utilities and businesses in this State. Accordingly, we assume original jurisdiction to settle the dispute as to whether petitioner or respondent is the lawful holder of the office.

## IV. THE ISSUE CONCERNING ALLEGED FAILURE OF MR. WATTS TO FILE THE CONSTITUTIONAL AND STATUTORY OATHS WITH THE SECRETARY OF STATE IS NOT PROPERLY BEFORE US.

Petitioner asserts the office of Corporation Commissioner held by Mr. Watts became vacant six months after Mr. Watts' term of office as a Corporation Commissioner began on January 14, 1991, by virtue of Mr. Watts' alleged failure to file with the Oklahoma Secretary of State the two constitutional oaths and one statutory oath required to be taken and subscribed to by a State public officer before entering upon the duties of the office. The statutes and constitutional provisions necessary for an understanding of this issue are as follows. OKLA. CONST. art. 15, § 1 says that before a public officer enters upon the duties of the office he or she shall take and subscribe to the provided constitutional oath or affirmation. OKLA. CONST. art. 15, § 2, in pertinent part, provides that the oath of § 1 shall be filed with the Secretary of State and that refusal to take the oath shall work a forfeiture of the office.

In addition to the general State constitutional oath found at OKLA. CONST. art. 15, § 1, Corporation Commissioners are required to take and subscribe to another State constitutional oath before entering upon their duties as set out in OKLA. CONST. art. 9, § 17. Section 17 also provides that this oath shall be filed with the Secretary of State. A third oath found at 51 O.S.1991, § 36.2A (the loyalty oath) is statutorily required to be taken by all public officers or employees and is also required to be filed with the Secretary of State. 51 O.S.1991, § 36.3.

Further, 51 O.S.1991, § 3:1, essentially provides that any person elected to public office that has failed to qualify and enter upon the duties of the office for any reason or cause at the time and in the manner provided by law and for six months thereafter has not qualified and entered upon the duties of the office, will cause the public office to become vacant. Also, OKLA. CONST. art. 9, § 15, gives to the Governor power to appoint a Corporation Commissioner when a vacancy exists in the office. Finally, 51 O.S.1991, § 8, in pertinent part, gives an appointing authority (here the Governor) the power to determine the fact by reason whereof a vacancy arises in an office.

 Petitioner's argument on the filing issue is as follows. A search of the records of the Secretary of State's office, evidenced by certificates of the search from the Secretary of State on December 29, 1994 and January 6, 1995, did not turn up any of Mr. Watts' three oaths. Petitioner argues this shows no filing of the oaths as required by the above constitutional and statutory provisions and, accordingly, Mr. Watts failed to qualify for the office of Corporation Commissioner within six months after his term began for that office in January of 1991. Petitioner further argues the result of this alleged nonfiling caused the office to become automatically vacant after the six month period pursuant to § 3.1 and the office was subject to

being filled by gubernatorial appointment after such time.

In our view, petitioner's argument, as the record now stands, suffers from an infirmity. Petitioner never alleges, nor does he present any evidence, that the appointing authority (i.e. Governor Walters) ever made an express determination Mr. Watts' office as Corporation Commissioner became vacant by reason of his failure to either take, subscribe to or properly file any of the three aforementioned oaths. Petitioner further does not allege that Governor Walters ever afforded Mr. Watts an opportunity to dispute, while Mr. Watts was still in the position of Corporation Commissioner and Governor Walters still held the appointing authority, any assertion the office became vacant by reason of failure to file the oaths with the Secretary of State. We believe the failure on petitioner's part to allege or show that Mr. Watts was given the opportunity to contest such a claim and the failure to allege or show Governor Walters made an express determination a vacancy occurred by reason of failure to file one or more of the oaths is a fatal flaw to petitioner's present claim to the office on the basis of this filing issue—such flaw ousting us of jurisdiction to consider the substantive merits of the failure to file question, either as a factual matter or as to the legal consequences of failure to file the oaths, assuming the oaths were not, in fact, filed with the Secretary of State.

As the record now stands there is a factual dispute as to whether Mr. Watts failed to file with the Secretary of State the three oaths that the parties stipulate he did take and subscribe on January 14, 1991. In such regard, respondent presents evidence in the form of affidavits and other evidentiary materials to the effect that Mr. Watts disputes the fact that he either failed to file or cause to be filed the oaths. The evidence submitted by respondent appears to show that in the normal course of business the oaths were submitted to the Secretary of State for filing by personnel of the Oklahoma Corporation Commission. Submissions of respondent further indicate that the Secretary of State's office appears to be casual in its handling of these oaths and, indeed, after a loyalty oath has been in the Secretary of State's office for four months it is transferred to the Records Center, Archives Division of the Department of Libraries, where it is destroyed after five years. Petitioner never directly asserts a search was conducted of this State depository, but only that the records of the Secretary of State were searched.

This present factual dispute is important because as we read 51 O.S.1991, § 8, before Governor Walters could find the fact of a vacancy in the office of Corporation Commissioner in this situation on the basis Mr. Watts failed to qualify for the office because of failure to file the required oaths in a timely fashion, it was incumbent on Governor Walters to afford Mr. Watts an opportunity for some type of minimal due process on the disputed factual issue to contest such a claim. In that the record is undisputed no such opportunity was afforded by Governor Walters, in our view, the dictates of minimal due process and fundamental fairness lead to the conclusion that no lawful or legitimate factual determination of vacancy could have been found by Governor Walters (assuming one was actually made) concerning any issue involved with Mr. Watts' filing of the oaths prior to Governor Walters leaving office on January 9, 1995.

In the case of *Worley v. State ex rel. Asbill,* 558 P.2d 430, 433–434 (Okla.Ct.App. 1976), Division 1 of the Court of Appeals, seemed to recognize that in order for a declaration of vacancy in office to be declared in conjunction with § 8, due process was mandated.[4] This view was consistent with the case of *State ex rel. Blankenship v. Freeman,* 440 P.2d 744, 756–757 (Okla.1968), where we recognized that even though a certain provision of the Oklahoma Constitution was self-executing as to its prohibition on Corporation Commissioners in regard to

---

4. Cf. *Callender v. District Court for the Twentieth Judicial District,* 625 P.2d 627, 629 (Okla.1981) (when there has been a final unappealed conviction for a crime that may result in forfeiture or vacation of office the failure of the appointing authority to find the facts surrounding vacancy is not fatal to district court's jurisdiction to determine whether the office was forfeited or to otherwise try the title to the office in an action brought by the Attorney General).

holding an interest in certain regulated companies, we held that where contested issues of fact are raised, a litigant whose office is sought to be declared vacant must be granted an opportunity to litigate in a proper judicial forum, all fact issues which may be involved. We further recognized in *Freeman* that where vacation or forfeiture of office was based on a violation of the general constitutional oath found at OKLA. CONST. art. 15, § 1, the language of OKLA. CONST. art. 15, § 2, required that a commissioner had to have been convicted in a court of competent jurisdiction before we had jurisdiction to make a judicial determination of forfeiture or vacancy in the office. *Freeman*, 440 P.2d at 753–754.

Although *Freeman* did not involve a construction of § 8 in regard to the failure of the appointing authority to initially determine the facts that create a vacancy after minimal due process, we believe *Freeman* does stand for the proposition that due process is implicated in decisions to find a vacancy or forfeiture in a public office. The reasoning of *Freeman*, coupled with the legislative directive in § 8 that the appointing authority is supposed to initially find the facts by reason of which a vacancy occurs, leads to the conclusion that we presently have no authority to make the factual determination in the first instance.

■ For a Governor to be entitled to act to fill a vacancy there must actually be a vacancy in an office. *Carpenter v. Carter*, 167 Okla. 238, 29 P.2d 83, 85 (1934). In order to implement the appointive authority given to the Governor (and others that have such authority by virtue of constitutional or statutory provision), the Legislature has set up an orderly procedure for filling a vacancy. Part of the procedure is a requirement that the Governor or other appointing authority make a substantive and real factual determination concerning the reason by which a vacancy has occurred. 51 O.S.1991, § 8. When the reason by which a vacancy is alleged to have occurred is disputed, it is our opinion that prior to making such a determi-

nation on an issue such as the failure to file question involved here there is a requirement that some type of minimal due process be afforded to the office holder. No such minimal due process was afforded here prior to the time either Mr. Watts or Governor Walters left State public office.

In our view, for us to make the factual determination in the first instance, would thwart the legislative will embodied in § 8 that it is the appointing authority that makes the determination in the first instance. Furthermore, in that petitioner's basis for claiming entitlement to the office of Corporation Commissioner in this quo warranto action is tied to a lawful and valid determination that a vacancy existed in the office at the time Governor Walters made his appointment, petitioner's claim to the office based on a vacancy grounded on the filing of oath issue, must fail because no valid determination of vacancy was made by Governor Walters on this basis prior to petitioner's appointment. In that no such lawful determination can now be made by Governor Walters because he has left office it is our view petitioner cannot now rely on any claimed shortfall on Mr. Watts' part in regard to filing of oaths with the Secretary of State to support his entitlement to the Office of Corporation Commissioner and we are without authority to delve into this asserted reason to support a determination of vacancy. Further, there is no necessity for us to decide here whether Mr. Watts' alleged failure to properly file the oaths would have been deemed in law to have caused a vacancy in the office of Corporation Commissioner.

## V. MR. WATTS' OFFICE AS CORPORATION COMMISSIONER WAS NOT VACANT AT THE COMMENCEMENT OF THE TERM OF CONGRESS.

■ Petitioner's other argument in support of his entitlement to the office of Corporation Commissioner is that Oklahoma constitutional and statutory law provides that when an individual holding a State public office is elected to a second public office, he

or she *ipso facto* vacates the first office when the term of the second office commences. Petitioner alleges here that the vacating date applicable was January 3, 1995 because the United States Constitution provides that the term for which Mr. Watts was elected in November 1994 began at noon on such date. Inherent in this argument is the position that neither the date of Mr. Watts' resignation nor the date he actually became a member of the United States House of Representatives was the vacating date for the office of Corporation Commissioner, but rather as noted, the vacating date was the commencement of the term of Congress, a date on which Governor Walters still possessed appointive authority. We disagree. In our view the first office is vacated when the office holder either resigns the first office or accepts the second office and that in this case both the resignation and acceptance occurred on January 9, 1995 and no vacancy subject to gubernatorial appointment occurred until such time.[5] We are further of the view that not until Mr. Watts took the oath of office as a Congressman and thereby became a member of the United States House of Representatives did he accept the position of Congressman, and not until such time would the dual office prohibition contained at OKLA. CONST. art. 2, § 12, be applicable to have *ipso facto* created a vacancy in the office of Corporation Commissioner. The statutory and constitutional provisions necessary to an understanding of this issue are as follows.

The first is OKLA. CONST. art. 2, § 12, which provides in pertinent part:

> No member of Congress from this State ... shall hold any office of trust or profit under the laws of this State.

The next is U.S. CONST. amend. XX, §§ 1 and 2 which provide:

> Section 1. The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3rd day of January, of the years in which such terms would have ended if this article had not been ratified: and the terms of their successors shall then begin.

> Section 2. The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the third day of January, unless they shall by law appoint a different day.

Further, U.S. CONST. art. VI, cl. 3 provides in pertinent part:

> The Senators and Representatives before mentioned ... shall be bound by Oath or Affirmation, to support this Constitution. ...

Also U.S. CONST. art. I, § 5, cl. 1 provides in pertinent part that:

> Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members. ...

Further, U.S. CONST. art. I, § 2, cl. 2 provides:

> No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Further, 26 O.S.1991, § 5–111, provides, among other things, that a candidate for public office file a declaration of candidacy wherein the candidate swears or affirms that, if elected, he will be qualified to hold the office. Finally, 51 O.S.1991, § 8, provides in pertinent part that a vacancy occurs in a public office by reason of resignation and that the person or entity authorized to fill a vacancy (here the Governor under OKLA. CONST. art. 9, § 15) is given the authority to determine the fact by reason whereof a vacancy in a State office occurs.

---

5. We note that the stipulations of the parties reveal that Mr. Watts' written resignation which was caused to be hand-delivered to Governor Keating after Governor Keating was sworn in as Governor on January 9, 1995 preceded Mr. Watts taking the oath of office for the United States House of Representatives. As such, delivery of the resignation appears to have been in reality the vacating event.

Our case law provides that when an office holder accepts an incompatible office the acceptance of the second office *ipso facto* operates to vacate the first office. *Gibson v. Crowder*, 196 Okla. 406, 165 P.2d 628, 629–630 (1946); *Wimberly v. Deacon*, 195 Okla. 561, 144 P.2d 447, 451–454 (1943). Petitioner relies on *Gibson, Wimberly*, two other cases and 26 O.S.1991, § 5–111, to support his assertion that our law mandates that vacation of the office of Corporation Commissioner occurred at the commencement of the Congressional term on January 3, 1995, because on said date Mr. Watts was entitled to hold the position of Congressman. The other two cases relied on to support this argument are *State ex rel. Oklahoma Tax Commission v. Mourer, supra* and *Riley v. Cordell*, 200 Okla. 390, 194 P.2d 857 (1948). Neither § 5–111 or any of the four cases support such a view.

*Wimberly* does not support the view that a State office holder vacates an office at the commencement of the term for a second office to which he has been elected. The facts in *Wimberly* were that a member of the Board of Regents of the University of Oklahoma, one C.O. Hunt, was called into active duty as a commissioned officer in the United States Army. 144 P.2d at 449. Hunt entered upon military duty as a commissioned officer without resigning his seat on the Board of Regents. *Id.* After Hunt's entry upon military duty the then Governor of Oklahoma, assuming a vacancy on the board, appointed someone to fill it. *Id.* Over a year later Hunt submitted his written resignation to the then Governor (successor to the one who had made the first appointment) who thereupon appointed another individual to the office. We held that the first appointment was valid because Hunt *ipso facto* vacated the office of board member under OKLA. CONST. art. 2, § 12, when he entered upon active military duty as a commissioned officer in the Army of the United States. *Wimberly* merely stands for the proposition that entering upon the duties of a second office or acceptance of a prohibited office *ipso facto* operates as a vacation of the

first office, notwithstanding the person's intention of continuing to hold the first office. In that Hunt had actually entered upon active duty in the United States military it was immaterial whether Hunt did not intend to resign from the Board of Regents until he submitted his resignation to the successor Governor because the office became vacant as a matter of law when he entered upon active duty in the United States military. *Wimberly* is merely a statement of the general rule that acceptance of the second office vacates the first and it does not lend credence to petitioner's argument that mere entitlement to hold a second office for which one has been elected vacates the first office.

*Gibson*, like *Wimberly*, involves a decision applying the general rule, that where a person holding an office under the laws of this State, accepts and enters upon the duties of a second public office, the acceptance of the second office operates to *ipso facto* vacate the first office notwithstanding the person's intention to retain the first office. The facts in *Gibson* were that at a meeting of the Board of Education for the City of Muskogee a member resigned and the remaining members appointed Gibson to the vacancy. 165 P.2d at 628. Gibson accepted the appointment or election, he at once qualified and entered upon the duties of the office. *Id.* At a later meeting the board, with Gibson present, refused to recognize him as a member because he had not resigned the office of City Treasurer of the City of Muskogee and had then or previously announced his intention to continue to hold the office of City Treasurer, an office he held prior to his appointment or election to the board of education. The board of education purported to appoint a new board member at this later meeting. In an action brought to determine whether Gibson or the person appointed subsequent was the lawful member of the board of education we held in favor of Gibson, holding that Gibson's acceptance of the office as member on the board of education operated to *ipso facto* vacate the office he previously held as City Treasurer. *Id.* 165 P.2d at 629–630. Thus, the board of education could

not appoint a replacement for Gibson because no vacancy existed, as he was validly holding the office as a member of the board of education. *Gibson*, thus, did not hold that it was entitlement to hold an office by election or appointment that was the key date, but like *Wimberly*, it was the acceptance or entering upon the duties of the office that was the determining factor as to when the first office was vacated.

The third case relied on by petitioner is *State ex rel. Oklahoma Tax Commission v. Mourer, supra. Mourer* was a case that had nothing to do with dual office holding or a determination that the acceptance of a second office by a state office holder *ipso facto* vacates the first office. In fact, *Mourer* did not concern the question of when a vacancy occurs in a public office by reason of a State public office holder's election or appointment to a second public office. It further did not hold that entitlement to an office at the beginning of a term automatically vacated a public office already held by the involved individual. As noted, *Mourer* did not deal with these issues. Accordingly, we do not find *Mourer* helpful in disposing of the question presented, to wit: when did the office of Corporation Commissioner held by Mr. Watts become vacant?

The final case relied on by petitioner is *Riley v. Cordell, supra. Riley*, as with *Mourer*, is distinguishable from the present case because it neither involved a dual office holding situation or a ruling by this Court that mere entitlement to an office at the beginning of a term translates into a vacancy in a current office held by an elected or appointed official. *Riley* was a pre-election case that involved the question of whether a person could run for the nomination to two public offices at the same time, one a justice of the Supreme Court and the other a United States Senator. Although no specific statute prohibited a person from becoming a candidate for more than one office this Court held the candidate could run for only one office at a time and that the filing of a notification and declaration of candidacy for the second office (United States Senator) operated to withdraw the prior notification and declaration of candidacy for the office of justice of the Supreme Court. In so ruling we analogized the situation to the prohibition against dual office holding which declares that when a public officer occupying one office enters upon the duties of another office, the acceptance of the second office operates *ipso facto* to vacate the first office. We cited *Wimberly* and *Gibson* as a statement of the rule.

We also relied on the then existent statute, 26 O.S.1941, § 162, which required that the declaration of candidacy contain a sworn statement that the candidate, if nominated, would accept the nomination and, if finally elected, would qualify for the office. Petitioner argues the present statute [26 O.S. 1991, § 5-111] on filing a declaration of candidacy, coupled with Mr. Watts' election to Congress, somehow had the effect of causing an automatic vacancy in the office of Corporation Commissioner at the beginning of the Congressional term. We disagree.

In the first instance, current § 5-111 does not contain the same language as contained in old § 162, which actually contained the form to be used for filing a declaration of candidacy. Section 5-111, in pertinent part, merely provides that a declaration of candidacy must contain a sworn oath or affirmation that the candidate, if elected, will be qualified to hold the office sought. The statute nowhere indicates it is concerned with the issue of when a candidate finally elected who then holds a State public office will be deemed to have vacated that office or that the Legislature intended § 5-111 to cause an automatic vacation of an office so held at the commencement of the term of the office to which the candidate is elected. Without such an expression of intent we read nothing into the current pertinent part of § 5-111 or the declaration required by it beyond a legislative recognition that the candidate must, at the time he is elected, then meet the then existent general statutory and/or constitutional qualifications to hold the office to which he has been elected. In the case of a member of the United States House of Representatives these qualifications are set forth

in U.S. CONST. art. I, § 2, cl. 2, as being attainment of the age of twenty-five years, United States citizenship for seven years and residence of the State. There is no dispute here as to whether Mr. Watts met these qualifications at the time of election and, indeed, that is not the issue before us. The issue before us is again, when did Mr. Watts' office as Corporation Commissioner become vacant?

Petitioner apparently attempts to tie the requirement in § 5–111, with the prohibition on dual office holding by a member of Congress contained at OKLA. CONST. art. 2, § 12, so that beginning of the term of Congress acts as the vacating event, even though the State office holder who has been elected to Congress has not become a member of that body prior to actual resignation from the State office. We do not believe § 5–111 can be stretched to reach such a result. To so hold would require a ruling contrary to the general rule stated in *Wimberly* and *Gibson* to the effect that Mr. Watts accepted the office of Congressman before he actually became a member of Congress and before he actually entered upon the duties of that office. As we have set out above *Riley* does not so hold nor has petitioner presented us with any other authority for this view. We reject petitioner's argument and, instead, adhere to our previous law as stated in *Wimberly* and *Gibson* that it is the actual acceptance of the office and entering upon the duties thereof which causes automatic vacation of the first office. Persuasive law teaches that in the case of a Congressman, acceptance does not occur until a member-elect actually becomes a member of the United States House of Representatives and only then would the dual office holding provision in the Oklahoma Constitution cause an automatic vacation of the State office.

In *United States v. Dietrich*, 126 F. 676 (C.C.Neb.1904), then Judge Van Devanter, speaking for the United States Circuit Court, held that a person appointed or elected to Congress does not become a member of that body until he has been accepted as a member and has assumed the duties of the office.

*Dietrich* was a case concerned with deciding when a person became a member of Congress in the context of determining whether a federal criminal statute was applicable, said statute in pertinent part only prohibiting the acts of members of Congress. *Dietrich* distinguished a member-elect from a member in various ways one of which was: "[w]hen we speak of a member of Congress we refer to one who is a component part of the Senate or House of Representatives; one who is in office, not out of office: one who is sharing the responsibilities and privileges of membership." *Id.* at 681. The *Dietrich* court further put it this way:

The defendant was not admitted to a seat in the Senate and did not enter upon the discharge of the duties of that office until December 2, 1901. Not until that day did the Senate consider or act upon his election, credentials, and qualifications. Until then it was not known, and could not have been, in the absence of an earlier session of the Senate, whether his election, credentials, and qualifications would be deemed by the Senate, the sole and exclusive judge, to be such as to entitle him to membership in that body. Immediately following the favorable action of the Senate upon his election, credentials, and qualifications, the defendant took the oath of office as a senator, which was an assumption of the duties of that office, but until then he had not accepted the office and was not obligated to its acceptance.

*Id.* at 682.

Other courts have reached similar results in analogous situations to the one presented here. In *Kelly v. Woodlee*, 175 Tenn. 181, 133 S.W.2d 473 (1939), the Supreme Court of Tennessee ruled that a district attorney general in that state did not vacate said office after his election to the office of United States Senator until he was accepted by that body as a member and until he was sworn into office as a Senator. The allegations in that case, as here, were that the district attorney general purposely held on to the office of district attorney general until a new Governor came into office in January of 1939,

so that this new Governor could appoint his successor for the state office, rather than the outgoing Governor. *Kelly* upheld the lawfulness of the new Governor's appointment rather than the former Governor's because no vacancy existed in the office of district attorney general until the seat in Congress was actually accepted.

In *State ex rel. O'Hara v. Appling*, 215 Or. 303, 334 P.2d 482 (1959), the Oregon Supreme Court determined that a Secretary of State did not vacate his office until he took the oath of office as the state's new Governor, a post to which he had previously been elected. The court in a quo warranto proceeding determined that the new Governor, not his predecessor, had the lawful authority to appoint a new Secretary of State. *State of Arizona ex rel. Pickrell v. Myers*, 89 Ariz. 167, 359 P.2d 757 (1961), also supports the view that a second office is not accepted merely because a legislative term or session begins, but that acceptance of a legislative office to which a person is elected does not occur until the oath of office is taken and the body accepts the person as a member. In *Myers* the Supreme Court of Arizona held that a person elected to the state legislature did not become a member of that body where he was absent when it convened and was not seated, so that his appointment thereafter to a judgeship was valid and not in violation of a dual office-holding provision of the Arizona Constitution.

There is also a U.S. Attorney General opinion from the 1800s that supports the position of respondent as to when someone elected to Congress becomes a member. In 14 U.S.Op.Atty.Gen. 406 (June 6, 1874), it was opined that a representative-elect did not become a member of the House until he was sworn in by taking the oath of office. The facts in the matter were that a person elected to the Forty-third Congress, the term beginning March 4, 1873, did not take the oath until December 1, 1873. Up to such time he held the position of counsel of the United States before the joint commission between the United States and Great Britain. 15 U.S.Op.Atty.Gen. 280 (May 19, 1877), following the previous Attorney General opinion, comes to the same conclusion, that a representative-elect did not become a member of the House until sworn into that office.

The above authority, we believe, is persuasive that it is the taking of the oath of office as a Congressman that is the event transforming a member-elect into a member of Congress and signifies acceptance of that office by the person elected to such a position. Taking the oath of office is a solemn declaration by an individual that the duties of the office will be faithfully carried out. The importance of the oath was recognized in these words found in Joseph Story's, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 969, pp. 688–689 (reprinted 1987):

> That all those, who are entrusted with the execution of the powers of the national government, should be bound by some solemn obligation to the due execution of the trusts reposed in them, and to support the constitution, would seem to be a proposition too clear to render any reasoning necessary in support of it. It results from the plain right of society to require some guaranty from every officer, that he will be conscientious in the discharge of his duty. Oaths have a solemn obligation upon the minds of all reflecting men, and especially upon those, who feel a deep sense of accountability to a Supreme being. If, in the ordinary administration of justice in cases of private rights, or personal claims, oaths are required of those, who try, as well as of those, who give testimony, to guard against malice, falsehood, and evasion, surely like guards ought to be interposed in the administration of high public trusts, and especially in such, as may concern the welfare and safety of the whole community But there are known denominations of men who are conscientiously scrupulous of taking oaths ... and, therefore, to prevent any unjustifiable exclusion from office, the constitution has permitted a solemn affirmation to be made instead of an oath, and as its equivalent.

Thus, taking the oath of office for Congress is a necessary ingredient to member-

ship in that body and, we believe, not until a member-elect actually takes the oath required of a member of the House of Representatives does vacation of a State office automatically occur under the dual office prohibition in our State Constitution.[6]

In view of the above law, to the extent that former Governor Walters had the authority to determine the facts by reason of which a vacancy occurred in the office of Corporation Commissioner under 51 O.S.1991, § 8, either his determination was arbitrary given the facts presently before us as heretofore submitted by the parties or he erred on a question of law, i.e. what it takes for one to accept and be accepted as a member of Congress, so that membership in that body would cause a vacancy in a State public office held immediately prior to membership in Congress. Further, in that neither Mr. Watts' resignation from the office of Corporation Commissioner or induction into office as a member of the United States House of Representatives had occurred at the time of the purported effective date of petitioner's appointment to the office of Corporation Commissioner, or before Governor Walters left office on January 9, 1995, petitioner's appointment was invalid because no vacancy existed in that office that was subject to gubernatorial appointment prior to Governor Keating's succession to the office of Governor on January 9th.

## VI. CONCLUSION.

In that this matter has statewide impact and involves title to a statewide public office it is *publici juris* in nature and we assume original jurisdiction to determine the controversy between petitioner and respondent. We hold that because Governor Walters made no lawful or legitimate determination that the office of Corporation Commissioner held by J.C. Watts, Jr. was vacated by reason of an alleged failure to file any required constitutional or statutory oath, while Governor Walters still held the office of Governor and Mr. Watts still held the office of Corporation Commissioner, we have no authority to make such a determination in the first instance. Further, as to the filing issue, in that no lawful or legitimate determination was made, petitioner may not rely on any

---

6. The dissent would hold that the dual office holding prohibition of OKLA. CONST. art. 2, § 12, is violated, not when Mr. Watts actually became a member of Congress, but when Mr. Watts was entitled to become a member, using the date of commencement of the Congressional term as the operative date for vacation of the State office of Corporation Commissioner. In the first instance, the dissent has cited no case from any jurisdiction having a similar constitutional provision to art. 2, § 12 of our Constitution that has so held. As we have stated, and as the dissent appears to admit, the rule—as stated in our previous cases as exemplified by *Gibson* and *Wimberly*—is that when one **accepts** a second office the first is automatically vacated. In effect, what the dissent of Justice Opala wants to do, because of his vision of good public policy, is to create a legal fiction to enlarge the prohibitory reach of art. 2, § 12 in contravention of the plain language of that constitutional provision which says, "[n]o member of Congress ..." to read "no member-elect of Congress after commencement of the congressional term". The dissent also seems to be of the view that, by judicial fiat, we should rule Mr. Watts accepted the position of Congressman before he actually accepted said position to foster this view of what good public policy should entail. Neither this Court or any court is at liberty to rewrite a clear and unambiguous constitutional provision merely because it does not reflect its vision of good public policy. The simple fact is that under our previous case law and that of other jurisdictions, entitlement to hold the second office is **not** the key date as to vacation of the first office, but it is **acceptance** of the second office one is entitled to hold that is the decisive date and the generally recognized manner for accepting an office is taking the required oath, which the dissent does not dispute. Whether good public policy would be fostered by a different provision than OKLA. CONST. art. 2, § 12, is not our concern because we are bound to apply the law as stated in that provision, not the law that we wish might have been stated. As noted in *Wimberly, supra*, "[t]he question, therefore, is not one of policy for us to promulgate, but rather, what did the framers of our constitution and those who adopted it in 1907 intend?" *Wimberly, supra*, 144 P.2d at 452. We finally note that the dissent's further reliance on OKLA. CONST. art. 9, § 16, to support its position is misplaced. Like, art. 2, § 12, the pertinent provision in art. 9 prohibits dual office holding, not the **potential** for dual office holding. Thus, no cogent argument can be made on the record before us under our current law that Mr. Watts vacated his position as Corporation Commissioner at any earlier time than when he resigned that position.

alleged failure to file these oaths with the Secretary of State to support his assertion he is the current lawful holder of the office of Corporation Commissioner involved in this action. Finally, Mr. Watts did not vacate his office as Corporation Commissioner based on the record presented until after Governor Walters left office on January 9, 1995 and, therefore, the appointment of petitioner to that office before January 9th was without validity because no vacancy existed in the office of Corporation Commissioner prior to that date and prior to Governor Keating's succession to the office of Governor.

Accordingly, for the reasons set forth above, **ORIGINAL JURISDICTION IS ASSUMED AND TITLE TO THE OFFICE OF CORPORATION COMMISSIONER IS SETTLED IN RESPONDENT, ED APPLE.**

KAUGER, V.C.J., LAVENDER, SIMMS, HARGRAVE and SUMMERS, JJ. concur.

HODGES, J., concurs as to I, II, III, V and VI; concurs in result as to IV.

WILSON, C.J., concurs in part; dissents in part.

OPALA, J., dissents.

WATT, J., disqualified.

OPALA, Justice, dissenting.

The court holds today that because J. C. Watts [Watts] was not a sworn member of the Congress on January 3, 1995, he did not vacate his Corporation Commission office until his January 9 resignation. The ·court concludes that—based on federal and foreign case law—Watts was hence not in violation of the state constitutional prohibition of dual office holding. I recede from the court's

characterization of the legal issue before us as one of federal law and from today's resolution. *The paramount question is whether the state interdiction of dual office holding was violated by Watts' failure to assume the duties of his congressional office. This issue implicates state policy and state law.* I would hold that the state constitutional prohibition against dual office holding *cannot be defeated by* mere inaction of the dual title-holder who purposefully abstains from entering into the duties of the second office. I would rest my decision on *state constitutional policy.*

**I**

**ANATOMY OF LITIGATION**

On January 14, 1991 Watts commenced a six-year term as an Oklahoma Corporation Commissioner. On July 11, 1994 he declared his candidacy for office of United States Representative, 4th District, Oklahoma. During his campaign he *stated his intention* to retain his Corporation Commission office and— if elected—to *delay* acceptance of the congressional post until a *newly-elected* governor could name his successor. After Watts' election to Congress, then-Governor David L. Walters appointed Charles Nesbitt [Nesbitt], effective January 9, 1995, to serve Watts' unexpired Corporation Commission term. The *term* of the 104th Congress began on January 3, 1995. It *assembled* on January 4, 1995 without Watts' attendance.

On January 9, 1995 Watts formally resigned as Corporation Commissioner and newly-inaugurated Governor Frank Keating appointed Ed Apple [Apple] to Watts' Corporation Commission seat.

Nesbitt brought this action in the nature of *quo warranto,*[1] invoking this court's original

---

1. Nesbitt's action is properly cast in the *nature of quo warranto.* 12 O.S.1991 § 1531 provides in pertinent part:
 "The writ of quo warranto, and proceedings by information in the nature of quo warranto are abolished and the remedies heretofore obtain-

 able in those forms may be had by civil action...."
 12 O.S.1991 § 1532 provides in pertinent part:
 "Such action may be brought *in the Supreme Court* or in the district court in the following cases:

jurisdiction[2] to settle title to Watts' Corporation Commission post.

## II

## THE ART. 2, § 12 OKLA. CONST.,[3] PROHIBITION AGAINST DUAL OFFICE HOLDING *CANNOT BE DEFEATED* BY MERE INACTION OF THE DUAL TITLE–HOLDER WHO ABSTAINS FROM ENTERING UPON THE DUTIES OF THE SECOND OFFICE

At common law[4] and under constitutional and statutory prohibitions against holding incompatible offices, a person who accepts a second office *ipso facto* vacates the first.[5]

Our jurisprudence recognizes and articulates this unassailable principle.[6] The historical requirement of *incompatibility* between the two offices is often removed by statutory and fundamental-law restatements of the doctrine, submerging that element into the public-policy underpinnings of the constitutional and legislatively-crafted provisions.[7] Where simultaneous office holding is forbidden by a *codification* of the common law, a *statutory or fundamental-law incompatibility* is created, *similar in its effect to that of the common-law element.*[8]

The public policy underlying this rule, sometimes called one of *implied-resignation,*[9] is designed to prevent confusion and to afford certainty—indispensable for protection of the public right to know which office

1st, When any person shall usurp, intrude into, or unlawfully hold or exercise any public office...." (Emphasis added.)

12 O.S.1991 § 1533 provides in pertinent part: "... [W]here the action is brought by a person claiming an interest in the office ... which is the subject of the action, it shall be prosecuted in the name and under the direction, and at the expense of such [person]...."

*See Abitbol v. Priore,* Okl., 797 P.2d 335, 336 (1990).

2. *See* 12 O.S.1991 § 1532, *supra* note 1.

3. Art. 2, § 12 Okla. Const. provides:

"No *member of Congress from this State,* or person holding any office of trust or profit under the laws of any other State, or of the United States, shall hold any office of trust or profit under the laws of this State." (Emphasis added.)

In another part, Art. 9, § 16, the State Constitution prohibits a corporation commissioner from *holding any federal office.* In its pertinent part Art 9, § 16 Okla. Const. expresses in these words the fundamental-law policy against dual office holding:

"... Nor shall any such commissioner *hold any other office under the government of the United States....*" (Emphasis added.)

4. Except as altered by our Constitution and statutes, the common law remains in full force. *Wright v. Grove Sun Newspaper Co., Inc.,* Okl., 873 P.2d 983, 987 (1994). 12 O.S.1991 § 2 provides in pertinent part:

"The common law, *as modified by constitutional* and statutory law, *judicial decisions* and the condition and wants of the people, shall remain in force...." (Emphasis added.)

5. *Dykeman v. Symonds,* 54 A.D.2d 159, 388 N.Y.S.2d 422, 426 (1976); *State v. Runslow,* 21 Conn.Sup. 294, 154 A.2d 526, 529 (1959); *Wimberly v. Deacon,* 195 Okl. 561, 144 P.2d 447, 452–453 (1944); *Kobylarz v. Mercer,* 130 N.J.L. 44, 31 A.2d 208, 211 (1943); *Fekete v. City of East St. Louis,* 315 Ill. 58, 145 N.E. 692, 693–694 (1924); *People v. Sohmer,* 211 N.Y. 565, 105 N.E. 647 (1914); *Oliver v. Mayor, Etc., of Jersey City,* 63 N.J.L. 634, 44 A. 709, 711 (1899); *Bishop v. State,* 149 Ind. 223, 48 N.E. 1038, 1041 (1898); *Attorney General v. Common Council,* 112 Mich. 145, 70 N.W. 450, 459 (1897); *cf. Gryzik v. State,* 380 So.2d 1102, 1104 (Fla.App.1980); *Smith v. Dillon,* 267 A.D. 39, 44 N.Y.S.2d 719, 723 (1943); *State v. Wait,* 92 Neb. 313, 138 N.W. 159, 163 (1912). No explanation is given for failure to follow this doctrine in a minority of jurisdictions. *See State v. Hill,* 181 Or. 585, 184 P.2d 366, 372 (1947); *Webb v. Reynolds,* 160 S.W. 152, 155 (Tex.1913). A narrow exception to the common law, the so-called "Alabama rule," finds the *second* office vacated where, under applicable law, the person is *ineligible* to hold it. *State ex rel. Van Antwerp v. Hogan,* 283 Ala. 445, 218 So.2d 258, 266 (1969).

6. *Gibson v. Crowder,* 196 Okl. 406, 165 P.2d 628, 629 (1946); *Wimberly, supra* note 5, 144 P.2d at 452–453.

7. *Wimberly, supra* note 5, 144 P.2d at 452–453.

8. *Wimberly, supra* note 5, 144 P.2d at 453; *Kobylarz, supra* note 5, 31 A.2d at 212.

9. *Advisory Opinion to Governor,* 121 R.I. 64, 394 A.2d 1355, 1357 (1978).

is held and which surrendered.[10] The rule applies equally where the second office—the acceptance of which vacates the first—is a *federal* rather than state position.[11] The national jurisprudence does not accommodate the possibility of a post-election contest.[12] If, *as here,* the second office is one within Congress, *any cloud* over title to that office may be *constitutionally decided only by Congress.*[13] The facts reveal no pending title dispute over Watts' congressional seat, clearing the path for application of the state-law rule.

Section 12, when construed together with Art. 9, § 16, *is* clear and unambiguous. The problem is not one of language analysis, but that of the Constitution's failure to provide a temporal point for the disqualification's beginning. Neither § 12 nor § 16 provides *when* one becomes a "member of Congress" within the meaning of our constitutionally-imposed legal disability concurrently to hold certain federal/state offices. I propose today to fill this gap in a manner that effectuates the clear purpose of the constitutional drafters. It keeps officials, like Commissioner Watts, from sitting on two stools six days beyond the earliest moment at which the new office could be claimed.[14]

The temporal point—when under § 12 one becomes a member of Congress—must be determined by a neutral, law-driven mechanism rather than the will of the title-holder.

Oklahoma's policy against dual office holding, expressed in our fundamental law,[15] stands violated *at the very instant* the choice between offices is left to the *whim of the holder* rather than governed by an implied-at-law election. When a holder's *claim* to the second office matures and becomes *present,* failure by him/her timely to exercise the right spawns confusion and uncertainty, trammelling the electorate's fundamental-law right to know who may wield what government authority. The right then becomes subject to and captive of the *undefined and unlimited power of the officeholder.* When the officeholder delays acceptance of the second office until the occurrence of a ritualistic contingency *wholly within his/her discretion* (oath-taking, assumption of duties), he/she offends the policy embodied in our fundamental law.[16]

On January 3, 1995 Watts was a duly *elected* and *qualified* Congressman but he was not then *acting.*[17] The *factum* of Watts' congressional membership turns on *state* rather than federal law because we are not called upon to test Watts' capacity to vote or to deliberate in Congress. Rather, we are testing his status *qua* state officer against a state constitutional dual office holding prohibition. Watts *can offend* that provision without meeting the "acting" element of the triad of office-holding attributes. On January 3, 1995 Watts had an *unclouded, present possessory claim* to his congressional office.

10. *Wimberly, supra* note 5, 144 P.2d at 453, 454.

11. *State v. McCarthy,* 255 Wis. 234, 38 N.W.2d 679, 680 (1949); *Wimberly, supra* note 5, 144 P.2d at 449; *Fekete, supra* note 5, 145 N.E. at 693; *Oliver, supra* note 5, 44 A. at 710; *Bishop, supra* note 5, 48 N.E. at 1038.

12. *Cf. Lesieur v. Lausier,* 148 Me. 500, 96 A.2d 585, 587 (1953).

13. *Sutherland v. Miller,* 79 W.Va. 796, 91 S.E. 993, 998 (1917). Art. 1, § 5, cl. 1 U.S. Const. provides in pertinent part:
 "Each House [of Congress] shall be the Judge of the Elections, Returns and Qualifications of its own Members. . . ."

14. Watts waited for six days from January 3, 1995 at twelve o'clock p.m. until the gubernatorial inauguration on January 9, 1995 to resign his Corporation Commission post.

15. Art. 2, § 12, *supra* note 3.

16. *See, e.g., Petition of Hennessey,* 146 Pa. Cmwlth. 520, 606 A.2d 612, 613 (1992); *Gryzik, supra* note 5 at 1104; *Advisory Opinion, supra* note 9, 394 A.2d at 1358; *Lesieur, supra* note 12, 96 A.2d at 587–588; *People v. Bagshaw,* 55 Cal. App.2d 147, 130 P.2d 237, 241 (1942).

17. A duly *elected* and *qualified* officer is *prima facie* entitled to enter into the duties of office. *Fleming v. Anderson,* 187 Va. 788, 48 S.E.2d 269, 273 (1948). An officer need not be *acting* to *hold* office. *See, e.g., Coates v. Parchman,* 334 S.W.2d 417, 424 (Mo.App.1960).

This is the point at which he could no longer hang onto his state office but rather *must be deemed to have abandoned it by operation of law.* I would so hold.

## III

### THE COURT IS CORRECT IN HOLDING THAT—IN THE FEDERAL–LAW SENSE—WATTS COULD NOT, UNTIL AFTER SWEARING–IN, BE *ACTING* AS A MEMBER OF CONGRESS

Congress is the arbiter of elections, qualifications and seating of *its* members.[18] Nonetheless,—where the forbidden office is one in state government—state proscriptions against dually holding state and federal offices present no trespass into congressional constitutional territory.[19] The common law and constitutional/statutory doctrine followed by state courts is a necessary attendant of state sovereignty.[20] Looking to federal law[21] solely for *guidance* in resolving today's issue, I would simply hold that *our state policy* against concurrent office holding is violated *upon commencement of the Congressman/woman's term of office*[22] and would not presume to usurp congressional authority to identify for itself and test title of individuals claiming *national* legislative

posts.[23] In the case before us Watts' status as a member of Congress *for congressional purposes* is not determinative of Nesbitt's claim. Were I searching for *indicia* of Watts' capacity to *act* as a member of Congress before taking an oath I would reach the very same conclusion as the court.

## IV

### AUTHORITY CITED BY APPLE IS CONTRARY TO OUR § 12 JURISPRUDENCE

Apple relies on *United States v. Dietrich,*[24] *Kelly v. Woodlee*[25] and *State v. Appling*[26] for the view that one cannot hold office in violation of dual office holding prohibitions until he/she is sworn into the second office. That is not the law in Oklahoma. *Dietrich,* a *pre–20th Amendment* federal case,[27] merely holds that a person elected to Congress must have taken the required oath of office before he/she could be *convicted of bribery*—an offense *in violation of that oath.*[28] The court in *Kelly* inappropriately relied on *Dietrich* in crafting its swearing-in requirement.[29] The Oregon Supreme Court in *Appling did not* rely on any public policy akin to that expressed in *our* jurisprudence, and was faced with a state constitutional provision authorizing officers to hold over until qualification of

---

18. Art. 1, § 5, cl. 1 U.S. Const., *supra* note 13; Art. 1, § 2, cl. 2 U.S. Const. provides:

 "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an inhabitant of that State in which he shall be chosen."

19. *Joyner v. Mofford,* 706 F.2d 1523, 1528–1531 (9th Cir.1983), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

20. *McCarthy, supra* note 11, 38 N.W.2d at 683.

21. Amend. 20, § 1 U.S. Const. provides in pertinent part:

 "... [T]he terms of Senators and Representatives [shall begin] *at noon on the 3d day of January....*" (Emphasis added.)

22. *See Lesieur, supra* note 12, 96 A.2d at 587–588.

23. State prohibitions of dual office holding may not call for vacation of a *federal* office. Art. 1, § 5, cl. 1 U.S. Const., *supra* note 13; *State ex rel. Santini v. Swackhamer,* 90 Nev. 153, 521 P.2d 568, 570 (1974); *State v. Senner,* 92 Ariz. 243, 375 P.2d 728, 730 (1962).

24. 126 F. 676, 681–682 (C.C.D.Neb.1904).

25. 175 Tenn. 181, 133 S.W.2d 473, 474 (1940).

26. 215 Or. 303, 334 P.2d 482, 485 (1959).

27. Amend. 20, § 1 U.S. Const., *supra* note 21.

28. *Dietrich, supra* note 24 at 681–682.

29. *Kelly, supra* note 25, 133 S.W.2d at 475.

their successors.[30] The law of that jurisdiction cannot hence be deemed to affect the *clearly articulated* Oklahoma rule that offending dual office holding occurs *at the moment uncertainty and confusion—caused by the whim of the officeholder*—arise.[31]

## V

## SECTION 12'S DISABILITY IS OF THE KIND WHICH *MAY NOT BE ESCAPED* BY THE ACTION OF THE OFFICEHOLDER

The terms of § 12 are triggered and its disability attaches when a state officer stands elected, mid-term, to be a member of Congress and the *congressional* term begins before the expiration of state office tenure.[32] *This* resulting disability may be neither defeated, escaped nor erased. The § 12 scenario must be distinguished from (1) that in which a state official under a statutory disability *to seek* another office during his/her term resigns, *removing the impediment*[33] and (2) where a member of the Oklahoma Legislature—mid-term—seeks an office *created or funded during the session* of which the candidate was a legislator.[34] In the first instance the statute's impact may be eluded through *voluntary, pre-candidacy resignation.*[35] The disability in the second causes an *unavoidable disqualification* with a prohibitory effect similar to § 12's, though not fueled by the same policy considerations.[36]

## VI

## CONCLUSION

Were I writing for the court today I would find Watts' Corporation Commission post vacated *ex lege* on January 3, 1995—the instant

he acquired an *unclouded*, present possessory claim to his congressional seat. That date *is* the temporal point when he became a member of Congress *within the meaning of our fundamental law's prohibition against dual office holding.* If it is to be given its clearly intended effect of prohibiting dual office holding, the Constitution *must* be deemed *violated* at the very instant a state officeholder *may take*—rather than *when he/she actually takes*—the newly-won federal office. The interdicted act of dual office convergence in the same person most certainly occurs *at the earlier point in time.* It is *then* that (a) the same person *first* becomes vested with a present possessory interest in two offices; (b) a severance of these interests becomes imperative to make the Constitution's ban meaningfully enforceable and (c) the winner's claim to his or her then-occupied state office must *be deemed at once* extinguished by the self-activated hand of the State's highest law. Today's adoption of a much less rigid enforcement regime for the Constitution's clear and unequivocal command significantly waters down the People's protection against a perceived political evil. I hence recede from the court's pronouncement.

---

30. *Appling, supra* note 26, 334 P.2d at 485.

31. *Wimberly, supra* note 5, 144 P.2d at 452–453.

32. *See Lesieur, supra* note 12, 96 A.2d at 587–588; *Bagshaw, supra* note 16, 130 P.2d at 241.

33. *See Oklahoma State Election Bd. v. Coats,* Okl., 610 P.2d 776, 780 (1980).

34. *See Fair v. State Election Bd. of Oklahoma,* Okl., 879 P.2d 1223, 1224 (1994).

35. *Coats, supra* note 33, 610 P.2d at 780.

36. *Fair, supra* note 34, 879 P.2d at 1224.